# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DAVID PAUL BOHLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-1373** |
| | ) | **Judge Aleta A. Trauger** |
| **CITY OF FAIRVIEW, TENNESSEE,** | ) | |
| **PATRICK H. STOCKDALE,** | ) | |
| **TIMOTHY SHANE DUNNING, JOSEPH** | ) | |
| **COX, RONNIE SCOTT COLLINS, PATTI** | ) | |
| **CARROLL, TONEY SUTTON, SHANNON** | ) | |
| **CRUTCHER, STUART JOHNSON,** | ) | |
| **TERRY HARRIS, SCOTT SMITH,** | ) | |
| **TERRY AMONETTE, ROY RUSSELL,** | ) | |
| **ZACH HUMPHREYS, and BRANDY** | ) | |
| **JOHNSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The following motions are pending before the court: a Motion to Dismiss filed by Joseph Cox, Timothy Shane Dunning, and Patrick H. Stockdale (Docket No. 32); a Motion to Dismiss filed by Roy Russell (Docket No. 36); a Motion to Dismiss filed by Terry Harris (Docket No. 64); a Motion to Dismiss and/or Motion for Summary Judgment filed by Terry Amonette (Docket No. 74); a Motion to Dismiss Filed by Scott Smith (Docket No. 79); a Motion to Dismiss filed by Patti Carroll, Shannon Crutcher, Stuart Johnson, and Toney Sutton (Docket No. 89); a Motion for Judgment on the Pleadings filed by Ronnie Scott Collins (Docket No. 92); a Motion for Judgment on the Pleadings filed by the City of Fairview (Docket No. 95); a Motion for Judgment on the Pleadings filed by Harris (Docket No. 107); and a Motion for Costs from Previous Action filed by Cox, Dunning, and Stockdale (Docket No. 34). For the reasons set out

herein, the various motions to dismiss, for judgment on the pleadings, or for summary judgment will be granted, and the motion for costs will be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

Bohler is a former detective with the Fairview Police Department ("FPD") in Fairview, Tennessee, a small city in Williamson County. (Docket No. 1 ¶¶ 1–2.) He has brought suit against the City of Fairview and a number of current and former Fairview employees and officials for causes of action arising out of events leading up to and surrounding his resignation from the FPD in October of 2016—a resignation that Bohler characterizes as a constructive discharge. (*Id.* ¶¶ 19, 128.) Bohler characterizes his exodus from the FPD as the culmination of several months of conflicts, cross-accusations, investigations, and punishments that threatened the careers of a number of high-ranking officers within the FPD. The court will attempt to concisely recount Bohler's version of those events below.

### A. Bohler's Initial Involvement in the Conflict between Mark Sutton and Pat Stockdale

Defendant Toney Sutton was, at most times relevant to this case, Fairview's vice mayor, a position that he no longer holds. (*Id.* ¶¶ 8, 45, 62, 90.) Former Vice Mayor Sutton is also the father of FPD Lieutenant and former Assistant Chief of Police Mark Sutton, who, although he is not a named party to this case, finds himself at the center of many of the underlying events. (*Id.* ¶¶ 25–26.) Specifically, Bohler claims that "most of the actions set forth [in the Complaint] were committed to cover up Mark Sutton's crimes and to protect his position with the Fairview Police Department." (*Id.* ¶ 26.)

---

[1] The facts set out herein are taken primarily from the Complaint. (Docket No. 1.) Except where otherwise noted, the facts are accepted as true for purposes of the motions to dismiss and motions for judgment on the pleadings. Because Amonette's motion relies on facts outside the Complaint, the court will consider it as a motion for summary judgment and rely upon Amonette's Statement of Undisputed Facts and Bohler's Response thereto (Docket No. 106) pursuant to Rule 56.

On February 3, 2016, Bohler was at his desk when he overheard a loud confrontation between then-Assistant Chief Mark Sutton and an FPD lieutenant, defendant Pat Stockdale. During the confrontation, Mark Sutton threatened to have Stockdale fired if Stockdale reported Sutton's alleged violations of department policies. (*Id.* ¶ 31.) Sutton's threats were, apparently, not particularly effective, as Stockdale promptly reported the altercation to City Manager Wayne Hall, who opened an internal investigation into Sutton's behavior. (*Id.* ¶¶ 32–33.)

Bohler provided a written statement to the investigation. In his statement, Bohler identified Mark Sutton as the primary aggressor in the confrontation with Stockdale. City Manager Hall placed Sutton, as well as the then-Chief of Police, defendant Terry Harris, on administrative leave starting on February 5, 2016, pending the results of the investigation that arose out of the disagreement between Sutton and Stockdale. A few days later, Hall announced that he had "accepted" Chief Harris's retirement. (*Id.* ¶¶ 34–35, 38.) With the positions of Chief of Police and Assistant Chief of Police vacant, Fairview Fire Chief Travis O'Neal was appointed as interim public safety director and was temporarily placed in charge of both the police and the fire departments. Meanwhile, Stockdale and another lieutenant, defendant Shane Dunning, became the highest ranking certified police officers remaining in the FPD. (*Id.* ¶¶ 36–37.)

**B. Bohler Looks Further into Stockdale**

Between February 15 and 18, 2016, District Attorney General Kim Helper contacted Bohler requesting documents missing from several case files that were due for presentation to the grand jury or were scheduled for trial. As part of those requests, Helper sought a *Miranda* waiver that was missing from the file involving the arrest of a citizen named Robert Hamilton. Upon reviewing Helper's request, Bohler recalled that, several months prior, he had been contacted by the same Robert Hamilton, who claimed, at the time, that Dunning and Mark Sutton had "set him

up" in a gun-related matter. At the time, however, Hamilton had not yet been arrested, so Bohler merely recommended that Hamilton contact the Chief of Police or the Tennessee Bureau of Investigation. (*Id.* ¶¶ 40–41.) Now, however, Bohler was able to connect the details in the file with Hamilton's earlier claims. Based on his review of the file, Bohler came to believe that Dunning had conspired with and acted on Mark Sutton's orders to fabricate evidence in order to retaliate against Hamilton for Hamilton's having filed a lawsuit against a close friend of Mark Sutton's, Byron Anderson. (*Id.* ¶ 42.) Bohler notified Stockdale and Interim Public Safety Director O'Neal of Hamilton's allegations. (*Id.* ¶ 43.)

Meanwhile, City Manager Hall's investigation of Mark Sutton continued. Hall discovered that Sutton had issued credentials that falsely identified auxiliary officers as full-time police officers and had regularly permitted auxiliary officers to wear FPD uniforms while providing security at events on behalf of a private company, APEX Security Group. (*Id.* ¶ 44.) On February 18, 2016, Hall informed the Fairview Board of Commissioners of his decision to terminate Assistant Chief Sutton. (*Id.* ¶ 45.) Sutton received his letter of termination of February 22, 2016. (*Id.* ¶ 47.) Bohler, however, remained concerned that no actions had been taken to address Dunning's alleged framing of Hamilton on gun charges. On February 29, 2016, Bohler took the Hamilton allegations directly to District Attorney General Helper. (*Id.* ¶ 48.)

## C. The Board of Commissioners Intercedes, Harris Unexpectedly Returns, and an Investigation into the Department is Launched by the County Sheriff's Office

The next day, March 1, 2016, it was announced—much to the surprise of the FPD rank-and-file—that Chief Harris had been reinstated as Chief of Police, despite the fact that his supposed retirement had been announced the previous month. Moreover, Stockdale and Dunning, mere weeks after having temporarily ascended to the positions of the FPD's highest ranking officers, had been placed on administrative leave. (*Id.* ¶ 49.) Harris held a meeting with

all FPD officers and employees, in which he told them that he had been called in by the Fairview Board of Commissioners and informed that the Williamson County Sheriff's Office ("WCSO") had launched a criminal investigation into individuals within the FPD. The Board asked Harris to return as Chief of Police, and he agreed to do so on the condition that Stockdale and Dunning be placed on leave until the investigation was concluded. (*Id.* ¶¶ 50–51.)

Because Chief Harris's announcement of his return came the day after Bohler had gone to District Attorney General Helper with his allegations against Stockdale and Dunning regarding the Hamilton setup, Bohler assumed—mistakenly—that his allegations had prompted the WCSO investigation. (*Id.* ¶ 52.) Bohler informed Harris that he believed that the investigation was based on the Hamilton allegations, and Harris asked Bohler to speak to defendant Sergeant Joseph Cox, in case Cox had additional information related to the Hamilton case. (*Id.* ¶¶ 63–64.) Cox refused to provide any additional information to Bohler, prompting Bohler to complain, again, to Harris. Harris suggested that Bohler go back to Helper, which Bohler did. On March 3, 2016, Helper notified Bohler that she had dismissed the charges against Hamilton. (*Id.* ¶¶ 66–67.) Meanwhile, Cox alerted Dunning that Bohler was looking into and drawing attention to the matter. At this point, Dunning and Cox decided to initiate a campaign of reprisal against Bohler. (*Id.* ¶ 68.)

**D. Stockdale, Dunning, and Cox Move Against Bohler**

On March 18, 2016, City Manager Hall resigned as City Manager to take the position of Codes Director. Hall continued acting as interim City Manager until a new City Manager could be hired. (*Id.* ¶ 69.)

Bohler identifies March 28, 2016, as the date on which the retaliation against him began in earnest. He states that, on that date, he "was questioned and required to answer unwritten, unsubstantiated allegations that he had used his authority as a detective in order to intervene in a

civil dispute." (*Id.* ¶ 70.) Bohler's description provides very little detail regarding either the complaints against him or the interrogation. Bohler does state, however, that he later learned that the complainant was an acquaintance of Dunning's and that Dunning had solicited the complaint in retaliation for Bohler's alerting authorities to the attempt to frame Hamilton. (*Id.* ¶¶ 71–72.)

On May 6, 2016, Stockdale and Bohler had a conversation in which Stockdale informed Bohler that Dunning was "out to get" him. Stockdale alleged that Dunning had solicited Cox to obtain several leave and sick time reports in order to accuse Bohler of "stealing sick time" by falsifying his time sheet. (*Id.* ¶ 74.) According to Bohler, both Dunning and Cox knew those allegations to be false. (*Id.* ¶ 75.) Bohler filed a formal complaint against Dunning and Cox with Chief Harris and Lieutenant Russell regarding the allegedly bogus time theft allegations. (*Id.* ¶ 76.)

**E. As Bohler's Conflict with Stockdale and Dunning Escalates, the Animosity within the Department Spills Over into Social Media**

On May 13, 2016, Chief Harris announced his impending retirement, just a few months after having surprisingly returned from an announced retirement earlier in the year. Harris informed Bohler—and several other people—that he had recommended Bohler to serve as interim Chief of Police in his absence. (*Id.* ¶ 80.) Around the same time, someone created a Facebook profile for a fictitious person named "P. Martin Shannon." Bohler alleges that the P. Martin Shannon profile was created and operated by "Stockdale and Dunning (and/or their agents)." (*Id.* ¶ 79.) Whoever actually operated the P. Martin Shannon Facebook page used it to discuss members of the FPD, including Bohler. For example, one day in May 2016, Bohler and Stockdale had a conversation touching on the issue of Bohler's girlfriend being hired by the FPD. The next day, P. Martin Shannon posted a false and distorted version of the same facts that Bohler had divulged to Stockdale, leading Bohler to believe that Stockdale was involved with the

post. Specifically, the fictional Shannon suggested, falsely, that Bohler had used his position to secure the job for his girlfriend. (*Id.* ¶ 81.) On May 16, 2016, Bohler informed Lieutenant Russell and Chief Harris that he believed Stockdale to be at least partially behind the P. Martin Shannon profile. (*Id.* ¶ 82.) Also on May 16, 2016, Bohler's partner, Jennifer Whittaker, informed Bohler that Chief Harris had told her that Bohler had been taken out of consideration for the position of interim Chief of Police, due, in part, to the allegations made via the P. Martin Shannon account. (*Id.* ¶ 83.)

On May 27, 2016, Stockdale, Dunning, and Cox met with Commissioner Shannon Crutcher, an ally of Mark Sutton's, at Stockdale's home. The four allegedly discussed the leave time allegations against Bohler. (*Id.* ¶ 87.) On the same day, Bohler met with another Commissioner, Allen Bissell, who informed him that Stockdale, Dunning, and Cox had repeated the leave time allegations to him as well. (*Id.* ¶ 88.) Dunning also allegedly repeated the allegations to another officer, defendant Terry Amonette, who later allegedly unlawfully accessed Bohler's personnel file. (*Id.* ¶¶ 91, 138.)

In May or June of 2016, Chief Harris and Lieutenant Russell required Bohler to submit to an interrogation conducted by a private investigator named Buddy Mitchell. Bohler's complaint does not go into detail about the subject matter of the interrogation, but it appears, from context, to have been about the leave time allegations. (*Id.* ¶ 92.)

At some point, Bohler posted a "cartoon" on his own Facebook page that Cox construed as negatively portraying him. Bohler claims that the cartoon "did not identify or resemble Cox in any way," although the court notes that a lack of visual resemblance or explicit identification does not preclude the possibility that the content of the cartoon would have been understood, by a person familiar with the situation, to refer in some way to Cox. On June 13, 2016, Cox

complained about the Facebook posting to his superiors. As a result, Bohler and Cox were required to participate in a dispute resolution meeting with Chief Harris and Lieutenant Russell. At the conclusion of the meeting, Harris and Russell instructed Bohler, in Bohler's words, "not to post anything on Facebook again." (*Id.* ¶¶ 93–94.)

## F. The WCSO Investigation Concludes, and Fairview Gets a New City Manager

The WCSO concluded its investigation on June 20, 2016, and briefed Chief Harris and the Board regarding the results. Those results, however, would not be made public until a month later. In the meantime, Chief Harris' retirement became official on June 29, 2016, and Scott Smith became the interim Chief of Police. (*Id.* ¶¶ 95–96.)

Finally, on July 21, 2016, the WCSO released a 19-page report on its investigation into the FPD. Although the report apparently confirmed some wrongdoing by Stockdale and Dunning, Bohler was unhappy with the results. He felt that the issues he had raised about Hamilton had been treated by the WCSO like an afterthought and that the report seemed to improperly exonerate Mark Sutton. According to Bohler, a later review of the full investigative case file confirmed that the July 21 report was crafted to cover up Sutton's history of wrongdoing. (*Id.* ¶¶ 102–06.)

## G. Stockdale and Dunning Sue the City; Mark Sutton Secures Reinstatement

On July 27, 2016, Interim Chief Smith issued letters formally notifying Stockdale, Dunning, and Mark Sutton of their terminations for violating various policies between February and July 2016. On the same date, Stockdale and Dunning filed suit in this court for retaliation, naming the City of Fairview, Hall, Harris, and every member of the Board of Commissioners as defendants. (*Id.* ¶¶ 107–08.)[2] Stockdale and Dunning immediately applied for temporary

---

[2] *Stockdale v. City of Fairview*, Case No. 3:16-cv-01945 (Sharp, C.J.) (closed pursuant to stipulation of dismissal, 9/8/16).

restraining orders preventing the city from finalizing their terminations. In their supporting affidavits, Stockdale and Dunning alleged that Bohler had threatened the two of them, as well as Dunning's family, in Facebook posts. Bohler insists that those allegations are baseless. (*Id.* ¶ 109.)

On August 1, 2016, Ronnie Scott Collins began his service as Fairview's City Manager, and, a few days later, the Board voted to delegate to Collins the authority to resolve the lawsuit by Stockdale and Dunning. (*Id.* ¶¶ 112–13.) On August 11, 2016, Collins suggested, in a meeting with Bohler and others, that Collins was in communication with Stockdale and Dunning and that Collins had grown concerned about Bohler's alleged Facebook activities. (*Id.* ¶ 114.)

Collins reached settlement terms with Stockdale and Dunning, and the Board voted to accept those terms, in what Bohler characterizes as a secret meeting. Bohler contends that, as part of the negotiations to resolve their claims, Stockdale and Dunning had pushed for informal assurances that actions would be taken by the City against Bohler. (*Id.* ¶ 117.) As a result, Collins agreed to what Bohler characterizes as an "unwritten term" of the settlement agreement: that, at some point after Stockdale and Dunning's return, Bohler would be discharged. (*Id.* ¶ 134.) Meanwhile, Collins granted Mark Sutton an appeal hearing, and it was determined that, although Sutton would not resume his duties as Assistant Chief of Police, he would be allowed to take a newly created lieutenant position in the FPD rather than be terminated. (*Id.* ¶ 116.) On September 1, 2016, Stockdale, Dunning and Sutton were all reinstated. (*Id.* ¶ 119.)

Stockdale, Dunning, and Sutton were each assigned to supervise one of the FPD's three patrol shifts. (*Id.*) Knowing the checkered history between Bohler and the newly reinstated supervisors, Interim Chief Smith assured Bohler and his partner, Detective Whittaker, that they

would answer directly to Smith, rather than being forced to be supervised by Stockdale, Dunning, or Sutton. (*Id.* ¶ 120.)

## H. Bohler Comes Under Fire for Nepotism and Leaves the Department

On October 1, 2016, Bohler married his girlfriend, an FPD patrol officer. Bohler maintains that, because his new wife "worked in an entirely separate chain of command" from him, their marriage and simultaneous employment did not violate any FPD or City of Fairview anti-nepotism policy. (*Id.* ¶ 121.) After Bohler and his wife returned from their honeymoon, however, he was called in to meet with City Manager Collins and Interim Chief Smith, who told Bohler that his being married to a patrol officer while he was a detective presented a potential violation of nepotism rules, because, as a detective, he was technically classified as a supervisor. Bohler told them that his wife intended to resign her position, which would resolve any such issue. Collins and Smith responded that, regardless of what Bohler's wife did, the FPD was planning to eliminate the position of detective in a departmental reorganization scheduled to take place later that month. (*Id.* ¶ 122.) They told Bohler that the only position that would be available to him after the reorganization was patrol officer, which would entail a demotion and a $10,000 reduction in his annual salary. Collins added that, going forward, "either Plaintiff or his wife would be required to work for one of" Stockdale, Dunning, or Sutton. (*Id.* ¶ 123.)

Soon after the meeting, Bohler submitted a grievance to Interim Chief Smith about the matter. He also e-mailed copies to the Mayor and Commissioners Crutcher and Bissell. City Manager Collins scheduled a grievance hearing for October 13, 2016, to be presided over by Mark Sutton and Codes Director Hall, whom Bohler identifies as a close friend of Toney Sutton. (*Id.* ¶¶ 124–26.) Feeling that the deck had been unfairly stacked against him and that he would not be afforded due process in the hearing, Bohler resigned. (*Id.* ¶ 128.)

**I. Bohler Sues the City and Others in State Court, Drops the Suit, and Initiates this Action**

On November 28, 2016, Bohler filed a Complaint in Williamson County Circuit Court against Stockdale, Dunning, Cox, and the City of Fairview. (Docket No. 35-1.) The Complaint covered the same general course of events regarding Stockdale, Dunning, and Cox as Bohler has described here, including the leave time allegations, the P. Martin Shannon Facebook profile, and the contention that Bohler had no choice but to resign in the face of having his grievance heard by a biased panel. (*Id.* ¶¶ 40, 48, 73.) On July 19, 2017, he notified the Circuit Court of his intent to voluntarily dismiss the state court action, and an order to that effect was entered on August 4, 2017. (Docket No. 35-2.) In a Declaration later filed with this court, Bohler's attorney explains that his "original intention was to file suit in federal court alleging, among other claims, a violation of Due Process" but that "preliminary research and evidence in hand led [him] to believe that [Bohler], as a Fairview police officer, did not have a property interest in his employment, which negated a required element of the Due Process claim." (Docket No 57-1 ¶ 3.) Believing that he lacked a federal claim or any other basis for federal jurisdiction, Bohler filed in state court.[3] However, according to Bohler's attorney, "a subsequent filing in federal court by counsel for . . . Stockdale and Dunning" in their federal suit against the city "revealed supporting evidence and a strong argument that Fairview police officers do in fact have a property interest in their jobs." (*Id.* ¶ 6.) Bohler and his counsel therefore agreed that they would drop the state lawsuit and file in federal court. (*Id.* ¶ 8.)

On October 15, 2017, Bohler filed his Complaint in this court, naming a substantially expanded list of defendants. Joining Stockdale, Dunning, Cox, and the city were Collins,

---

[3] The court notes, however, that Bohler's contention that he did not believe he had a federal claim until he learned facts suggesting that he had a property interest in his job is somewhat difficult to reconcile with the fact that he has filed multiple federal claims, under theories that are not limited to the deprivation of a property interest without due process, in this court.

Crutcher, Harris, Smith, Amonette, Toney Sutton, Brandy Johnson, former City Commissioner Stuart Johnson, Fairview Mayor Patti Carroll, and new Fairview Chief of Police Zack Humphreys. (Docket No. 1 at 1.) Bohler pleads ten counts, and his Complaint is, unfortunately, not always clear about which counts are directed at which defendants. Count I is a claim, pursuant to 42 U.S.C. §§ 1983 and 1985, for conspiracy to deprive Bohler of his constitutional rights. (*Id.* ¶¶ 152–54.) Count II is a § 1983 claim for deprivation of due process. (*Id.* ¶¶ 155–62.) Count III is a § 1983 claim for violation of Bohler's right to free speech. (*Id.* ¶¶ 163–68.) Count IV is a § 1983 claim for the denial of Bohler's right to equal protection. (*Id.* ¶¶ 169–74.) Count V is a claim for violation of Tennessee's Public Protection Act and common law retaliation. (*Id.* ¶¶ 175–79.) Count VI is a claim for defamation by slander or libel. (*Id.* ¶¶ 180–83.) Count VII is a claim for unlawful invasion of privacy. (*Id.* ¶¶ 184–88.) Count VIII is a claim for official oppression in violation of Tenn. Code Ann. § 39-16-403. (*Id.* ¶¶ 189–94.) Count IX is a claim for tampering with or fabricating evidence in violation of Tenn. Code Ann. § 39-16-503. (*Id.* ¶¶ 195–201.) Count X is a claim for intentional interference with employment. (*Id.* ¶¶ 202–05.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the

grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## B. Rule 12(c)

A motion under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622–23 (6th Cir. 2012). "For purposes of a motion for judgment on the pleadings, all well-pleaded allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). However, the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* at 581–82. It is well settled that a Rule 12(c) motion should be granted when there is no material issue of fact and the party making the motion is entitled to judgment as a matter of law. *Id.* at 582.

## C. Rule 56

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Timeliness of § 1983 Claims

The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). The applicable

limitations period in Tennessee is one year. Tenn. Code Ann. § 28-3-104(a); *see Howell v. Farris*, 655 F. App'x 349, 351 (6th Cir. 2016). "Although the applicable time period is borrowed from state law, the 'date on which the statute of limitations begins to run in a § 1983 action is a question of federal law.'" *Howell*, 655 F. App'x at 351 (quoting *Eidson*, 510 F.3d at 635). Under federal law, the limitations period ordinarily begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* That is, the cause of action accrues upon the occurrence of the event that "should have alerted the typical lay person to protect his or her right." *Id.* (quoting *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)). At that point, the plaintiff has a "complete and present cause of action," such that she may "file suit and obtain relief." *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).

The Supreme Court held, in 2016, that a constructive discharge claim accrues, and the limitations period begins to run, when an employee gives notice of his resignation, not on the effective date of that resignation. *Green v. Brennan*, —— U.S. ——, 136 S.Ct. 1769, 1782 (2016). In *Green*, the plaintiff alleged constructive discharge in violation of Title VII. *Id.* at 1775. Relying on the standard rule for limitations periods, which provides that a limitations period commences "when the plaintiff has a complete and present cause of action," the Court found that the complete and present cause of action arose when the plaintiff resigned. *Id.* at 1776.

Finding that the resignation triggers the limitation period, the Court then addressed the question of when precisely an employee resigns. The Court noted that, in an ordinary wrongful discharge claim, the limitations period begins to run on the date the employer notifies the employee that he is fired, not on the last day of his employment. *Id.* at 1782. "Likewise here," the Court stated, "we hold that a constructive discharge claim accrues—and the limitations

period begins to run—when the employee gives notice of his resignation, not on the effective date of that resignation." *Id.*; *see also Mayo v. Kenwood Country Club, Inc.*, 166 F.3d 1214 (table decision), 1998 WL 863624 at * 2 (6th Cir. Nov. 23, 1998) ("[T]he employee effectively determines when he or she is constructively discharged by resigning. Therefore, we conclude that in a constructive discharge the limitation period begins when the employee resigns, not the final day of employment.").

The overwhelming majority of events described in the Complaint occurred more than a year before Bohler filed his federal claims. Several of the defendants argue that Bohler's constructive discharge, as well, occurred more than a year before the Complaint, placing the date of his announcement of resignation on October 13, 2016. In support of that contention, the defendants have produced what they purport to be Bohler's letter of resignation. (Docket No. 93-1.) Bohler has not raised any basis for doubting the veracity of the letter that the defendants have produced, nor does he dispute that, if he did, indeed, announce his resignation on October 13, 2016, then a claim based on his constructive discharge would be untimely under *Green*. Nevertheless, he argues that it would be improper for the court to grant the defendants' 12(b)(6) or 12(c) motions in that regard because, even if his claims are, in fact, untimely, their untimeliness is not apparent on the face of his Complaint.[4]

Pursuant to Federal Rule of Civil Procedure 8(c), the argument that a plaintiff's claims are barred by the applicable statute of limitations is an affirmative defense and, as the Sixth Circuit has noted, a plaintiff "generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)). For this reason, a motion under Rule 12(b)(6) or 12(c) is generally considered an "inappropriate vehicle" for dismissing a claim that falls outside of the

---

[4] Although one party, Amonette, has moved for summary judgment, he does not do so on this ground.

relevant limitations period. *Id.* It is only when the allegations in the Complaint "affirmatively show that the claim is time-barred" that dismissing that claim on the pleadings is appropriate. *Id.* (citing *Jones*, 549 U.S. at 215) ("If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim[.]")).

At first glance, it appears that Bohler is correct that, as written, his Complaint does not technically concede that he submitted his resignation on October 13, 2016. It strongly suggests as much—describing all of the events leading up to that date, culminating in Bohler's "realiz[ing] that he was *going to be* denied due process in" his hearing scheduled for October 13, 2016, prompting him to resign. (Docket No. 1 ¶¶ 126–28 (emphasis added).) The Complaint does not, however, outright state, on its face, that he submitted his resignation on that date. The court's inquiry, though, does not end there, because Bohler, in describing his resignation, appears to specifically refer to the letter that the defendants have produced. Bohler describes his "submit[ing] his resignation, which listed October 20, 2016 as his last day." (*Id.* ¶ 129.) That language is a clear reference to the aforementioned letter, the body of which reads, in full:

> Please accept this letter as notice of my resignation and retirement from law enforcement, effective, October 20, 2016. I have served as an active sworn law enforcement officer since 1997. This resignation is being submitted to avoid placement into an unfair and untenable position being created by the planned restructure of the police department.
>
> I respectfully request retired officer credentials. My years of service exceed minimum requirements established by U.S. Code 926C and Tennessee Code Annotated 38-8-123.

(Docket No. 93-1.) That letter is dated October 13, 2016. (*Id.*)

Generally speaking, if, in support of a motion under Rule 12(b)(6) or 12(c), "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The obligation to treat a

motion to dismiss as a summary judgment motion is typically mandatory if matters outside the pleadings are not excluded by the court. *See Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 503 (6th Cir. 2006) (applying Rule 12(d) to a Rule 12(c) motion). However, a court may consider matters outside the pleadings without converting the motion to a Rule 56 motion if the documents are "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." 5B Wright & Miller, Federal Practice and Procedure § 1357 (3d ed.), *cited in Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Bohler's October 13, 2016 letter is both referenced in his Complaint and integral to his claim, because it represents the formal notice of the severing of the employment relationship. The letter, moreover, merely confirms the clear implication of the Complaint that Bohler resigned as an alternative to going forward with the October 13, 2016 hearing. The court, therefore, will consider the letter without the need for converting the parties' various motions to motions for summary judgment. Based on the allegations in the Complaint, as confirmed by and incorporated through the letter, any claim by Bohler for constructive discharge is untimely.

Bohler argues, in the alternative, that the court should not consider this a case of constructive discharge, but of actual discharge, because he was not allowed to continue working to his desired October 20, 2016 end date. Specifically, he alleges that he was actually discharged on October 18, 2016, because it was on that date that he discovered that he had been locked out of his work email account, despite the fact that he intended to continue working for the FPD for two more days. Bohler does not identify any cases, however, suggesting that a plaintiff can pursue a ¶ 1983 claim based on an actual discharge that occurred after his announced and

accepted resignation. Moreover, it is simply not the case that being locked out of an email system is synonymous with being terminated from one's job. Even assuming that the FPD had some obligation to honor Bohler's desired exit date—which is questionable—he has not identified any basis for concluding that it had a duty to maintain his email privileges. The argument regarding Bohler's email privileges, then, is not so much one of an actual discharge, but a later-arising constructive discharge.

Bohler's own language in his Complaint, however, leaves little doubt that he alleges that his constructive discharge occurred on or around his October 13, 2016 hearing:

> 126. On October 12, 2016, City Manager Collins responded to Plaintiff's grievance by emailing a calendar request for a grievance hearing scheduled to take place on October 13 at 11 AM. Mark Sutton (whom Plaintiff had reported for the conspiracy against Hamilton) and former city manager now Codes Director Wayne Hall (a close personal friend of Toney Sutton) were scheduled to preside over the hearing along with Mr. Collins.

> 127. This placed Plaintiff in the position of having his grievance hearing adjudicated by three people he believed were responsible for the grievance. Mark Sutton was specifically named in Plaintiff's grievance letter.

> 128. Plaintiff realized that he was going to be denied due process in the matter. Faced with a demotion, a $10,000 pay cut, and deliberate assignment into a retaliatory and hostile environment, Plaintiff was forced to resign from the Fairview Police Department.

> [. . . .]

> 161. By assigning Mark Sutton to preside over the [October 13, 2016] final grievance hearing that was requested by Plaintiff, Ronnie Scott Collins denied Plaintiff's right to a meaningful forum for which his grievance could be presented and deliberated impartially.

> 162. Plaintiff was left with no choice but to resign.

(Docket No. 1 ¶¶ 126–28, 161–62.) The letter, which Bohler mentions and partially paraphrases in the Complaint, confirms both (1) the October 13, 2016 date and (2) that, by the time Bohler was locked out of the FPD email system, he had already affirmatively announced his resignation

because, he believed, he had been put in an untenable situation. What he has pled is clearly a claim premised on his constructive discharge more than one year before the filing of the Complaint on October 15, 2017. The moving defendants, therefore, are entitled to dismissal or, as applicable, judgment on the pleadings with regard to the § 1983 claims against them.

Not all of the defendants, however, have so moved. The following defendants have moved for dismissal of Bohler's § 1983 claims as untimely: Scott Smith (Docket No. 79-1 at 4–5); Ronnie Scott Collins (Docket No. 93 at 7–8); the City of Fairview (Docket No. 96 at 7–8); Terry Harris (Docket No. 108 at 6–7)[5]; and the "Commissioner Defendants"—Patti Carroll, Shannon Crutcher, Stuart Johnson and Toney Sutton (Docket No. 90 at 8–10). Two other defendants who were originally named—Zack Humphreys and Brandy Johnson—have already been voluntarily dismissed. (Docket No. 63.) Patrick H. Stockdale, Timothy Shane Dunning, and Joseph Cox do not appear to be included in Bohler's § 1983 claims. (Docket No. 1 ¶¶ 143–74; Docket No. 55 at 1–2 ("Plaintiff subsequently nonsuited the case and refiled the action in Middle District of Tennessee on October 15, 2017, adding additional causes of action against additional defendants. Plaintiff's allegations of defamation by Defendants Stockdale, Dunning, and Cox remain unchanged.") That leaves two defendants—Roy Russell and Terry Amonette—who are mentioned in Bohler's § 1983 claims but who have not moved to dismiss those claims based on

---

[5] Bohler argues that Harris waived the statute of limitations defense by raising it only in his later-filed Rule 12(c) Motion and not his original Rule 12(b)(6) Motion or his Answer. At the time that Harris filed his Rule 12(c) Motion, however, the Rule 12(b)(6) Motion was still pending. The court, accordingly, will consider those motions together. Bohler, moreover, has not suffered any prejudice from Harris's omission, as the timeliness issues in this case were raised by numerous other parties. The court, accordingly, will not treat Harris's defense as waived. *See In re Cipriano*, No. 14-14826, 2015 WL 3441212, at *8 (E.D. Mich. May 28, 2015) (noting that statute of limitations defense that was apparent on the face of the complaint is "not waived simply because it was raised in a motion to dismiss rather than in the answer" (quoting *Pierce v. Oakland County*, 652 F.2d 671, 672 (6th Cir. 1981)); *Peacock v. Equifax, Inc.*, No. 3:13-CV-651-PLR-HBG, 2015 WL 1457996, at *1 (E.D. Tenn. Mar. 30, 2015) (applying rule that, where no prejudice occurs and statute of limitations defense is raised by motion, the court may hold that the defense was not waived by failure to include it in an earlier responsive pleading).

untimeliness, although both have argued for dismissal and/or summary judgment on other grounds. The court, accordingly, will address Russell and Amonette's arguments relevant to their § 1983 claims on the merits.

## B. Dismissal of § 1983 Claims Against Russell on the Merits

### 1. Procedural Due Process

To succeed on his federal due process claim, a plaintiff must show that he possessed a constitutionally protected property or liberty interest and that the defendants deprived him of that interest without adequate process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Property interests are not created by the Constitution, but are instead created and defined by "existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Some—but not all—public employees have a protectable property interest in their continued employment or in particular employment-related benefits. *See Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017); *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 605 (6th Cir. 2016). For purposes of his motion to dismiss, Russell concedes that Bohler had a property interest in his continued employment by the FPD. Russell argues, however, that Bohler has failed to argue a deprivation of due process associated with that interest, or, at least, has failed to do so with regard to any actions by Russell.

"A constructive discharge may constitute a deprivation of property within the meaning of the Fourteenth Amendment." *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004) (citing *Parker v. Bd. of Regents of Tulsa Jr. Coll.*, 981 F.2d 1159, 1161 (10th Cir. 1992); *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988); *Findeisen v. N. E. Indep. Sch. Dist.*, 749 F.2d 234, 236–39 (5th Cir. 1984); *Parrett v. Connersville*, 737 F.2d 690, 694 (7th Cir.

1984)). Russell argues that, even if Bohler was constructively discharged, he has not identified any particular due process to which he was entitled but which he was denied.

In response, Bohler identifies only one alleged violation of due process attributable to Russell: that Russell, as Bohler's superior officer, required Bohler to submit to an interrogation by a private investigator without the benefit of counsel and without notice of the allegations under investigation. Bohler, though, has not identified any basis for claiming that he was, as a matter of constitutional due process, entitled to counsel at that stage of a disciplinary investigation related to his employment. Bohler has identified certain statutory protections to which officers are entitled when facing disciplinary charges, but they require only that certain process be afforded before discipline is imposed; they do not guarantee a right to full notice of allegations or a right to counsel as soon as an investigation into an officer begins or an officer is questioned. *See* Tenn. Code Ann. §§ 38-8-304, -305.

Bohler argues that he was entitled to counsel in his interrogation because the interrogation was "implicitly criminal [in] nature." (Docket No. 62 at 3.) Insofar as that is true, the attendant right to counsel would be unrelated to the deprivation of Bohler's "constitutionally protected property interest in his employment," which he identifies in his Complaint as the basis for Count II. (Docket No. 1 ¶ 156.) Bohler cannot simply mix-and-match between the right of which he was deprived and the process to which he was due; if his claim is about the loss of his job, he must plead that he was deprived of a level of due process related to that interest. At least with regard to Russell, he has not done so. The court, accordingly, will dismiss Count II as it pertains to Russell.

### 2. First Amendment Retaliation

A cause of action for First Amendment retaliation requires an employee to demonstrate that: "(1) [he] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Mills v. Williams*, 276 F. App'x 417, 418 (6th Cir. 2008) (citing *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). Russell argues that Bohler has failed to allege any actions by Russell that were in retaliation for any protected speech or conduct.

In response, Bohler argues that his First Amendment rights were violated because, after Bohler came under fire for his Facebook activities, Russell gave him "orders . . . not to post anything on Facebook again." (Docket No. 1 ¶ 94.) Bohler's allegations, however, are extraordinarily vague. First, Bohler's Complaint never actually informs the reader what the Facebook posts at issue consisted of. Bohler claims that some of his posts had been construed as threatening, but that they were not. The actual content of those posts, however is left a mystery. (*Id.* ¶ 109.) Similarly, Bohler states that he posted a cartoon that Cox construed as critical of him, but Bohler does not describe the cartoon, its message, or its context. Instead, Bohler merely states that "the cartoon did not identify or resemble Cox in any way." (*Id.* ¶ 93) Of course, a cartoon might be directed at a person by mocking his perceived attitudes, beliefs, or behaviors without including an explicit visual representation of the person himself. Again, however, what was actually said is left to the imagination because of Bohler's deliberate decision to include an incomplete version of events.

The nature of Russell's order to Bohler regarding future Facebook use is similarly unclear. Read literally, the command "not to post anything on Facebook again" could be read to suggest that Bohler was ordered never to post anything to Facebook, for any purpose, at any time ever again. That such a demand would have been made, however, does not strike this court as particularly plausible. It may be that Russell merely instructed Bohler not to post anything similar to what he had previously posted or ordered him not to post anything about his conflict with Cox or other FPD officers. It is difficult, though, to infer what might have been ordered, given that it is unclear what Bohler said in the first place.

What Bohler has alleged, then, is that he posted something on Facebook, which he has not described, and that he was then ordered to refrain from further Facebook activity, in some way, in the future. Those allegations fall short of even the relatively forgiving demand that the plaintiff provide a short and plain statement plausibly suggesting an entitlement to relief. There is nothing inherently unconstitutional about expecting a public employee to curtail certain aspects of his social media activity on work-related matters. It is true that restrictions on public employees' speech may run afoul of the First Amendment in a number of ways. *See Boulton v. Swanson*, 795 F.3d 526, 532–33 (6th Cir. 2015) (collecting cases). Without an explanation of what those restrictions actually entailed or what speech was at issue, however, a plaintiff has not set forth a plausible statement that he is entitled to relief. Bohler's First Amendment-related claim directed at Russell, therefore, will be dismissed.

### *3. Equal Protection*

Russell argues that Bohler's Count IV, based on a violation of his right to equal protection, should be dismissed because he relies impermissibly on a "class-of-one" theory of liability that is not applicable to his situation. "The Equal Protection Clause prohibits

discrimination by the government that '[1] burdens a fundamental right, [2] targets a suspect class, or [3] intentionally treats one differently than others similarly situated without any rational basis for the difference.'" *Superior Commc'ns v. City of Riverview, Mich.*, No. 17-1234, 2018 WL 651382, at \*10 (6th Cir. Feb. 1, 2018) (quoting *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty.*, 430 F.3d 783, 788 (6th Cir. 2005)). That "third kind" of equal protection violation is often referred to as a "'class-of-one' violation." *Id.* (quoting *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 832 (6th Cir. 2009)). The "class-of-one theory of equal protection," however, "does not apply in the public employment context." *Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 607 (2008).

Bohler does not attempt to defend his equal protection claim against Russell in his Response to Russell's Motion to Dismiss. (Docket No. 62.) Count IV, accordingly, will be dismissed as to Russell.

### *4. Conspiracy*

Finally, Russell argues that Bohler has not alleged that Russell was part of any conspiracy to deprive Bohler of his constitutional rights. The Sixth Circuit has defined a civil conspiracy under 42 U.S.C § 1983 as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not know all of the details of the illegal plan or all of the participants involved. All that must be shown is that there is a single plan, that the alleged co-conspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985). Conspiracy claims must be pled with a degree of specificity. *Hamilton v. City of Romulus*, 409 F. App'x 826, 835–36 (6th Cir. 2010).

Vague and conclusory allegations unsupported by material facts are insufficient, although circumstantial evidence of an agreement among all conspirators may provide adequate proof. *Id.*

The only overt acts that Bohler identifies by Russell in furtherance of the alleged conspiracy are (1) Russell's forcing Bohler to submit to an interrogation and (2) Russell's response to Bohler's Facebook activities. (Docket No. 62 at 6.) Again, however, Bohler provides only partial descriptions of the relevant events, without an explanation of how the alleged actions were in furtherance of an actual conspiracy to deprive him of his constitutional rights. Bohler's argument, in essence, seems to be that, because he quit due to what he perceived as his mistreatment by the FPD and Fairview city government, then everyone who allegedly mistreated him along the way was a coconspirator. Without allegations showing an agreement to injure him by unlawful action, however, Bohler has not pled conspiracy. Count I, therefore, will be dismissed as against Russell.

## C. Amonette's Motion for Summary Judgment

Amonette has filed a motion for summary judgment, arguing that his only involvement in this matter was his receipt of a lawfully obtained, redacted version of Bohler's personnel file and that such actions do not give rise to liability under any of the claims Bohler has raised. In his Response, Bohler does not appear to dispute the premise that his claims against Amonette are based on the assumption that Amonette's possession of Bohler's personnel file was either unlawful or in furtherance of an unlawful objective. A review of the Complaint confirms that the plaintiff is alleging that, although Amonette may have played a role in the various power struggles within FPD, his actual involvement in any actions taken against Bohler himself appears to be limited to his possessing Bohler's personnel file, which Bohler contends invaded his

privacy and was part of an effort to improperly investigate him in retaliation for his First Amendment-protected activities. (Docket No. 1 ¶¶ 90–92, 138–49, 168, 185, 187, 200.)

In response to Amonette's Statement of Undisputed Facts, Bohler has conceded that Bryant Beatty Kroll, an attorney,[6] submitted a June 2, 2016 open records request for certain FPD personnel files, including Bohler's. (Docket No. 106 ¶ 3.) Bohler also concedes that Kroll then received a redacted version of the file. (*Id.* ¶¶ 4–6.) Kroll maintains that he then sent the file to Stockdale, Dunning, and Amonette. Bohler disputes that contention but offers, as his only ground for that dispute, what he purports to be a copy of the relevant email from Kroll to Stockdale, Dunning, and Amonette. (Docket No. 105-1 at 3.) Bohler's attorney, in a Declaration, states that the email "does not appear to show any attachments"—which, apparently, Bohler intends the court to take as establishing that Amonette did not, in fact, get the personnel file from Kroll. (*Id.* ¶ 4.) A rudimentary examination of what Bohler has provided, however, reveals that it is not, in fact, a printout of the email from Kroll to Amonette and the others, but a printout of a later email *forwarding* the Kroll email. (*Id.* at 3.) The lack of an attachment on the forwarded email, therefore, says nothing whatsoever about whether Kroll had attached the personnel file to the original email. If anything, then, Bohler has corroborated the allegation that Amonette obtained the personnel file from Kroll, who, it is undisputed, obtained it lawfully.

Bohler attempts to rescue his claim by misconstruing a portion of an earlier discovery order by the court. On February 16, 2018, the court denied Bohler discovery intended to uncover the purpose of Amonette's having a copy of Bohler's file. (Docket No. 83 at 1.) The court wrote:

> Amonette states that he considers it to be "legally irrelevant why Mr. Amonette's attorney secured a copy of the Plaintiff's personnel file, and . . . what capacity and what matters Mr. Kroll was representing Mr. Amonette in at the time the public

---

[6] Amonette claims that he was represented by Kroll. Bohler disputes that Kroll represented Amonette at the time of Amonette's receiving a copy of Bohler's personnel file. (Docket No. 106 ¶ 2.) Amonette does not, however, base his argument on any premise requiring him to establish an attorney-client relationship.

records request was made." (Docket No. 82 ¶ 8.) The court construes Amonette's response as conceding that he is not entitled to summary judgment on any theory that requires, as a matter of law, that he (1) establish any particular purpose for accessing Bohler's file or (2) establish the scope of any attorney-client relationship with Kroll at the time the file was obtained. Accordingly, discovery on those two issues is unnecessary.

(*Id.* at 2.) Bohler reads the statement that Amonette "is not entitled to summary judgment on any theory that requires . . . that he . . . establish any particular purpose for accessing Bohler's file" to mean that Amonette cannot argue that he is entitled to summary judgment on the ground that includes contending that his access to the file was permissible. Quite to the contrary, though—the point of the court's language was that Amonette has argued—correctly—that there is no legal requirement that he have some specific legitimate purpose for having the file in order for his access to be lawful. Tennessee's Public Records Act "requires that 'all state, county and municipal records shall, at all times during business hours . . . be open for personal inspection *by any citizen of this state*, and those in charge of the records shall not refuse such right of inspection to any citizen, *unless otherwise provided by state law*." *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 864 (Tenn. 2016) (quoting Tenn. Code Ann. § 10–7–503(a)(2)(A)) (emphasis altered). In other words, the Act makes records available to any Tennessee citizen unless there is some reason, in law, that the records are exempt. Bohler has identified no requirement—and the court knows of none—that would require a Tennessee citizen to justify his access to a public record in terms of some particular purpose, as long as the relevant situation does not run afoul of some exception to the Act.

The Tennessee Supreme Court "has interpreted the legislative mandate of the Public Records Act to be very broad and to require disclosure of government records even when there are significant countervailing considerations." *Gautreaux v. Internal Med. Educ. Found., Inc.*, 336 S.W.3d 526, 529 (Tenn. 2011) (citing *Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d

681, 684 (Tenn. 1994)). Accordingly, as a public record, Bohler's redacted personnel file was accessible, as a matter of law, to any citizen of Tennessee upon an appropriate request. Bohler's Count VII is premised on the assumption that Amonette's having access to Bohler's personnel file was an "an unreasonable intrusion into [Bohler's] privacy," but Tennessee law is clear that the redacted personnel file was not private. Although Tennessee does recognize some torts based on invasion of privacy, Bohler has identified none that would cover the situation here. *See Burnette v. Porter*, No. W2010-01287-COA-R3CV, 2011 WL 4529612, at *3 (Tenn. Ct. App. Sept. 30, 2011) ("Tennessee recognizes four types of invasion of privacy: '(a) unreasonable intrusion upon the seclusion of another . . . (b) appropriation of the other's name or likeness . . . (c) unreasonable publicity given to the other's private life . . . (d) publicity that unreasonably places the other in a false light before the public . . . .") (quoting Restatement (Second) of Torts § 652A(2) (1977); citing *Givens v. Mullikin*, 75 S.W.3d 383, 411 (Tenn. 2002); *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643 (Tenn. 2001)).

Of course, an otherwise lawful action may still form the basis of a claim for retaliation under the First Amendment. As the court has already explained, however, retaliation requires that some adverse action be taken against the plaintiff by the defendant. *See Mills*, 276 F. App'x at 418. Bohler has identified no case law that would support concluding that merely possessing an employee's personnel file would amount to an adverse action. Nor can the claims against Amonette be salvaged by reframing them in terms of a conspiracy with the defendants who did engage in arguable adverse actions against him (but who have successfully moved for the § 1983 claims against them to be dismissed), because all of Bohler's allegations that Amonette acted in furtherance of a shared purpose to unlawfully injure Bohler are conclusory and speculative. *See*

*Hamilton*, 409 F. App'x at 835–36. Amonette's motion for summary judgment, therefore, will be granted.


### D. Supplemental Jurisdiction Over State Law Claims

Each of the defendants, other than the two already voluntarily dismissed, has shown that he, she, or it is entitled to dismissal or summary judgment with regard to Counts I through IV, which are the only claims that Bohler has raised under federal law. His Complaint makes clear that the sole basis for this case to be in federal court was the federal question jurisdiction arising out of those § 1983 claims. Counts V through X, which plead causes of action under Tennessee statutes and/or common law, are therefore before the court pursuant to its supplemental jurisdiction over related claims. A district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's'] original jurisdiction that they form part of the same case or controversy." *Carmichael v. City of Cleveland*, 571 F. App'x 426, 434 (6th Cir. 2014) (quoting 28 U.S.C. § 1367(a)). Claims form part of the same case or controversy when they "derive from a common nucleus of operative fact." *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

Even where supplemental jurisdiction exists, however, the court may decline to exercise that jurisdiction for the following reasons:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for
        declining jurisdiction.

28 U.S.C. § 1367(c); *see also Baer v. R & F Coal Co.*, 782 F.2d 600, 603 (6th Cir. 1986)

("[P]endant jurisdiction is a doctrine of discretion, not of plaintiff's right.") (quoting *United*

*Mine Workers*, 383 U.S. at 726). District courts generally have broad discretion in deciding

whether to decline or elect to exercise supplemental jurisdiction over state law claims. *See*

*Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) (citing

*Transcon. Leasing, Inc. v. Mich. Nat'l Bank of Detroit*, 738 F.2d 163, 166 (6th Cir. 1984)),

*amended by, and reh'g en banc denied*, 1998 WL 117980 (6th Cir. Jan. 15, 1998).

Some of the defendants—namely, Stockdale, Dunning, Cox, Collins, and the City of

Fairview—have expressly asked the court to decline to exercise supplemental jurisdiction over

the claims against them. Even with regard to the defendants that have not so moved, however,

the court sees little reason to continue to exercise its jurisdiction over Bohler's state law claims.

*See Alexander v. Byrd*, No. 14-1022, 2014 WL 5449626, at *10 n.3 (W.D. Tenn. Oct. 24, 2014)

(discussing authority of court to decline to exercise supplemental jurisdiction *sua sponte*). In the

absence of Bohler's constitutional claims, this case is fundamentally about conflicts between

various employees and officers of a Tennessee local government and whether one of those

employees, Bohler, was afforded the protections to which he was entitled under Tennessee law.

The court sees no reason that the federal courts are the forum best suited for consideration of

those matters. Accordingly, the court will decline to exercise jurisdiction over the state law

claims and will dismiss those claims without prejudice.

## E. Stockdale, Dunning, and Cox's Rule 41(d) Motion

Stockdale, Dunning, and Cox have also moved the court, pursuant to Federal Rule of Civil Procedure 41(d), to grant them costs and attorney's fees related to the voluntarily dismissed state case. That Rule provides as follows:

> If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied.

"The plain language of Rule 41(d) makes clear that an award under the rule lies within the sound discretion of the trial court." *Hython v. City of Steubenville*, Case Nos. 95–3629, 95–3669, 1996 WL 456032, at *4 (6th Cir. Aug. 12, 1996); *see also Noel v. Guerrero*, 479 F. App'x 666, 669–70 (6th Cir. 2012) (granting a motion for voluntary dismissal without prejudice and noting that this does not unfairly expose a defendant to the possibility of duplicative litigation expenses because costs may be awarded upon refiling under Rule 41(d)). The Sixth Circuit has explained that "nothing in the language of Rule 41(d) . . . suggests that a defendant must show bad faith before a district court can order payment of costs incurred in a voluntarily dismissed action." *Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 874 (6th Cir. 2000) (quoting *Esquivel v. Arau*, 913 F. Supp. 1382, 1388 (C.D. Cal. 1996)). Rather, the Sixth Circuit has observed that Rule 41(d) is meant

> not only to prevent vexatious litigation, but also to prevent forum shopping, especially by plaintiffs who have suffered setbacks in one court and dismiss to try their luck somewhere else. . . . Hence, Rule 41(d) is also intended to prevent attempts to gain any tactical advantage by dismissing and refiling th[e] suit.

*Id.* (internal citations omitted).

Bohler responds by arguing, first, that the court should decline to grant costs because his decision to dismiss and re-file was justified by his learning—only after filing his state court

claims—that he had federal constitutional claims as well. That account of events, however, has very little to do with Bohler's claims against Stockdale, Dunning, and Cox, which consist primarily of allegations related to common law defamation. The claims against Stockdale, Dunning, and Cox may be sufficiently related to Bohler's federal claims to fall within this court's supplemental jurisdiction. That does not mean, though, that Bohler is entitled to be free of consequences for forcing the parties to start over because he decided to change his overall theory of the case with regard to a number of other defendants. An award of costs could, therefore, be appropriate. Bohler argues next that, even if the court awards costs, an award of attorney's fees would be impermissible under Rule 41(d), as it has been construed by the Sixth Circuit. *See Rogers*, 230 F.3d at 874 ("We now hold that attorney fees are not available under Rule 41(d).").

The court declines to impose costs on Bohler in this instance. There is no evidence that he chose to resort to federal court to avoid some setback in the state proceedings, which would support an award. Moreover, Bohler's failure to file his federal claims in a timely manner means that he has already paid a steep price for whatever procedural gamesmanship he may have been engaged in. The motion for costs, therefore, will be denied.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motions to Dismiss or for Judgment on the Pleadings (Docket Nos. 32, 36, 64, 79, 89, 92, 95, 107) and Amonette's Motion for Summary Judgment (Docket No. 74) will be granted. The Rule 41(d) motion filed by Stockdale, Dunning, and Cox (Docket No. 34) will be denied.

An appropriate order will enter.

ENTER this 19th day of June 2018.

_____
ALETA A. TRAUGER
United States District Judge