| | | |
|---|---|---|
| DAVID PAUL BOHLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-1373 |
| | ) | Judge Aleta A. Trauger |
| CITY OF FAIRVIEW, TENNESSEE, | ) | |
| PATRICK H. STOCKDALE, | ) | |
| TIMOTHY SHANE DUNNING, JOSEPH | ) | |
| COX, RONNIE SCOTT COLLINS, PATTI | ) | |
| CARROLL, TONEY SUTTON, SHANNON | ) | |
| CRUTCHER, STUART JOHNSON, | ) | |
| TERRY HARRIS, SCOTT SMITH, | ) | |
| TERRY AMONETTE, ROY RUSSELL, | ) | |
| ZACH HUMPHREYS, and BRANDY | ) | |
| JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

David Paul Bohler has filed a Motion to Alter or Amend Judgment (Docket No. 119), to which Responses have been filed by Terry Amonette (Docket No. 123), Joseph Cox, Timothy Shane Dunning, and Patrick H. Stockdale (Docket No. 124), the City of Fairview (Docket No. 125), and Patti Carroll, Shannon Crutcher, Stuart Johnson, and Toney Sutton (Docket No. 127), and Bohler has filed a Reply (Docket No. 131). For the reasons set out herein, Bohler's motion will be granted in part and denied in part.

# BACKGROUND AND PROCEDURAL HISTORY[1]

Bohler is a former detective with the Fairview Police Department ("FPD") in Fairview, Tennessee, a small city in Williamson County. (Docket No. 1 ¶¶ 1–2.) On November 28, 2016, Bohler filed a Complaint in Williamson County Circuit Court against Stockdale, Dunning, Cox, and the City of Fairview, pleading claims for defamation and violations of the Tennessee Public Protection Act ("TPPA") related to the events leading up to Bohler's departure from the FPD in October 2016. (Docket No. 35-1.) On July 19, 2017, he notified the Circuit Court of his intent to voluntarily dismiss the state-court action, and an order to that effect was entered on August 4, 2017. (Docket No. 35-2.)

In a Declaration later filed with this court, Bohler's now-former, then-current attorney, Stephen E. Grauberger, explained that his "original intention was to file suit in federal court alleging, among other claims, a violation of Due Process" but that "preliminary research and evidence in hand led [him] to believe that [Bohler], as a Fairview police officer, did not have a property interest in his employment, which negated a required element of the Due Process claim." (Docket No 57-1 ¶ 3.) Believing that he lacked a federal claim or any other basis for federal jurisdiction, Bohler filed in state court. However, according to Bohler's attorney, "a subsequent filing in federal court by counsel for . . . Stockdale and Dunning," in their own, separate federal suit against the city, "revealed supporting evidence and a strong argument that Fairview police officers do in fact have a property interest in their jobs." (*Id.* ¶ 6.) Bohler and his counsel therefore agreed that they would drop the state lawsuit and file in federal court. (*Id.* ¶ 8.)

On October 15, 2017, Bohler filed his Complaint in this court. (Docket No. 1.) He asserted claims under 42 U.S.C. § 1983 against several defendants, including many who were not included

---

[1] The facts underlying this case are set out in detail in the Court's June 19, 2018 Memorandum. (Docket No. 115 at 2–12.)

in his original state-court complaint. (*Id.*) He also asserted a number of state law claims. (*Id.*) In the months following Bohler's filing of his federal Complaint, a number of motions were filed: a Motion to Dismiss filed by Cox, Dunning, and Stockdale (Docket No. 32); a Motion to Dismiss filed by Roy Russell (Docket No. 36); a Motion to Dismiss filed by Terry Harris (Docket No. 64); a Motion to Dismiss and/or Motion for Summary Judgment filed by Amonette (Docket No. 74); a Motion to Dismiss Filed by Scott Smith (Docket No. 79); a Motion to Dismiss filed by Carroll, Crutcher, Johnson, and Sutton (Docket No. 89); a Motion for Judgment on the Pleadings filed by Ronnie Scott Collins (Docket No. 92); a Motion for Judgment on the Pleadings filed by the City of Fairview (Docket No. 95); a Motion for Judgment on the Pleadings filed by Harris (Docket No. 107); and a Motion for Costs from Previous Action filed by Cox, Dunning, and Stockdale (Docket No. 34). On June 19, 2018, the court entered a Memorandum and Order granting the various dispositive motions and denying the motion for costs. (Docket Nos. 115–16.) Specifically, the court held that Bohler's claims under 42 U.S.C. § 1983 were untimely and dismissed the claims against the defendants who had raised the statute of limitations in their motions; dismissed the § 1983 claims against Russell on the merits; granted summary judgment to Amonette; and declined to exercise supplemental jurisdiction over Bohler's state law claims.

On July 18, 2018, Bohler—now represented by new counsel—filed a Motion to Alter or Amend Judgment, arguing that the court erred by dismissing the claims against some of the defendants as untimely. (Docket No. 119.) He further argues that the court should reconsider its decision not to exercise supplemental jurisdiction over the state law claims. He does not dispute the court's rulings on the federal claims against Scott Collins, Terry Amonette, Roy Russell, or Scott Smith. (*Id.* at 2 n.1.)

**LEGAL STANDARD**

Under Rule 59(e) of the Federal Rules of Civil Procedure, a court may alter or amend a judgment based on: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice. *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) (citing *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). A motion under Rule 59(e) is not, however, a vehicle for presenting new legal arguments that could have been raised before a judgment was issued. *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007); *Leisure Caviar*, 616 F.3d at 616 (noting movant "cannot use a Rule 59 motion to raise arguments which could, and should, have been made before judgment issued" (citation and internal quotation marks omitted)). In the Sixth Circuit, "[t]he grant or denial of a Rule 59(e) motion is within the informed discretion of the district court, reversible only for abuse." *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 467 (6th Cir. 2009) (quoting *Scotts Co. v. Central Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005)).

**ANALYSIS**

In its original Memorandum and Order, the court resolved the federal claims raised by Bohler and declined to exercise jurisdiction over the state law claims. Accordingly, the court will first consider whether Bohler is entitled to resurrect some or all of his federal claims under Rule 59(e) and will then turn, if necessary, to the state law claims.

**I. Federal Claims**

**A. Claims against the City of Fairview**

Bohler argues first that the court should not have dismissed his claim against the City of Fairview as untimely because his cause of action against the City was timely under Tennessee's savings statute, Tenn. Code Ann. § 28-1-105. Bohler concedes that he did not originally make this

argument in response to the City's motion but argues that he should nevertheless be allowed to raise it now, because failing to apply the savings statute would amount to a clear error of law and a manifest injustice. The City responds that Bohler's failure to raise the savings statute amounts to a waiver and that Rule 59(e) does not provide an avenue for him to put forth a new argument that he failed to raise at the appropriate time. The City argues next that, even if the savings statute argument is properly before the court, the argument fails, because the savings statute does not apply to Bohler's § 1983 claim.

Generally speaking, "Rule 59(e) motions are aimed at *re*consideration, not initial consideration," and therefore are not considered an appropriate avenue for raising an issue for the first time. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (quoting *FDIC v. World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir. 1992)). Bohler can hardly be said to have lacked the opportunity to consider the full range of possible responses to the argument that his § 1983 claims were untimely. To the contrary, the statute of limitations was raised multiple times by multiple parties. (*See, e.g.*, Docket No. 79-1 at 4–5; Docket No. 90 at 8–10; Docket No. 93 at 7–8; Docket No. 96 at 7–8; Docket No. 108 at 6–7). Specifically, the argument that Bohler's claims were barred by the one-year statute of limitations was raised at least as early as Scott Smith's Amended Answer on December 20, 2017. (Docket No. 59 at 9.) The City indicated that it wished to raise the defense itself in its February 8, 2018 Motion to Amend Answer (Docket No. 77 at 1), which was granted—unopposed—on March 1, 2018 (Docket No. 86 at 1; *see* Docket No. 88 ¶ 212). The City indicated that it intended to rely on the statute of limitations as a basis for judgment on the pleadings a week later. (Docket No. 96 at 7.) In his Response to the City's motion, Bohler made no mention of the savings statute and, indeed, made no attempt at all to defend the timeliness of any § 1983 claim accruing as of the date of his resignation notice. Instead, he merely

argued for slightly later dates of accrual. (Docket No. 101 at 2–4.) Those arguments failed as a defense to the Motion for Judgment on the Pleadings, and Bohler does not argue, in his Motion to Alter or Amend, that the court erred—clearly or otherwise—in its determination of the initial date of accrual.

The court filed its Memorandum and Order resolving the various pending motions on June 19, 2018. (Docket Nos. 115 & 116.) Bohler, by that point, had had months during which he could have sought to file supplemental briefing if he realized he had failed to raise an important issue. Moreover, it was Bohler's own counsel, with Bohler's consent, who made the wholly voluntary, strategic decision to dismiss Bohler's state-court claims in the first place. Bohler and his counsel could have, at the time, made sure that they knew what they would need to do and argue in order to establish that his federal-court claims would be considered timely. Allowing Bohler to raise the savings statute now, after so many failed opportunities to do so, would be, at the very least, near the outer bounds of what is contemplated by Rule 59(e). *See Randy's Towing, LLC v. Charter Twp. of Oscoda*, No. 16-10806, 2016 WL 5745552, at *2 (E.D. Mich. Oct. 4, 2016) ("Plaintiffs' statute of limitations argument is not based on any newly discovered evidence or any intervening change in law. Plaintiffs are therefore foreclosed from raising the argument in the first instance in this post-judgment motion.").

Moreover, even if the court were inclined to apply Rule 59(e) to give an appropriate plaintiff a second chance to present a new argument based on the savings statute, the movant would need to show not only that the savings statute would clearly apply to his claims, but also that no other ground for dismissal or judgment on the pleadings raised by the defendant was sufficient to support the judgment. As Bohler's new counsel is no doubt aware, the statute of limitations is simply one argument, out of several, that the City of Fairview raised in its motion. Nevertheless,

Bohler devotes the entirety of his briefing to arguing that the court's statute of limitations conclusion was erroneous and represents a manifest injustice. No manifest injustice, however, would result from dismissing a claim under the statute of limitations, when the claim was simply destined to be dismissed on the merits. In order to justify his Motion to Alter or Amend, therefore, Bohler must show, at a minimum, that both (1) the savings statute clearly applies to his claim; and (2) none of the other grounds for dismissal raised by the City was meritorious.

### *1. The Savings Statute*

"The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). The applicable limitations period in Tennessee is one year. Tenn. Code Ann. § 28-3-104(a); *see Howell v. Farris*, 655 F. App'x 349, 351 (6th Cir. 2016). "Although the applicable time period is borrowed from state law, the 'date on which the statute of limitations begins to run in a § 1983 action is a question of federal law.'" *Howell*, 655 F. App'x at 351 (quoting *Eidson*, 510 F.3d at 635). Under federal law, the limitations period ordinarily begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* That is, the cause of action accrues upon the occurrence of the event that "should have alerted the typical lay person to protect his or her right." *Id.* (quoting *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)). At that point, the plaintiff has a "complete and present cause of action" such that he may "file suit and obtain relief." *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). As this court held, authoritative Supreme Court precedent establishes that Bohler's claims for constructive discharge accrued on the day he

submitted his resignation, October 13, 2016. (Docket No. 115 at 15 (citing *Green v. Brennan*, 136 S.Ct. 1769, 1782 (2016).) Bohler filed his federal suit a year and two days later.

Tennessee's savings statute permits a plaintiff to revive voluntarily dismissed claims, among others, against a defendant, provided that the claims are re-asserted within one year of a non-merits dismissal:

> If the action is commenced within the time limited by a rule or statute of limitation, but the judgment or decree is rendered against the plaintiff upon any ground not concluding the plaintiff's right of action . . . the plaintiff . . . may commence a new action within one (1) year . . . .

Tenn. Code Ann. 28-1-105(a). The savings statute expands the time a plaintiff has to refile a claim, when the original complaint and the new complaint allege substantially the same cause of action, including identity of the parties. *Foster v. St. Joseph Hosp.*, 158 S.W.3d 418, 422 (Tenn. Ct. App. 2004). The savings statute is intended "to aid the courts in administering fairly between litigants without binding them to minor and technical mistakes made by their counsel in interpreting the complexities of the laws of procedure." *Foster*, 158 S.W.3d at 422 (quoting *Henley v. Cobb*, 916 S.W.2d 915, 917 (Tenn. 1996)). Because Tennessee law favors the resolution of disputes on their merits, the savings statute is considered remedial and is to be construed liberally in furtherance of its purpose. *Freeman v. CSX Transp., Inc.*, No. M2010-01833-COA-R9-CV, 2011 WL 1344727, at *4 (Tenn. Ct. App. 2011) (citing *Balsinger v. Gass*, 379 S.W.2d 800 (1964)); *Energy Sav. Prods.*, 737 S.W.2d at 785; *Foster*, 158 S.W.3d at 422; *Henley*, 916 S.W.2d at 916; *see also Laney Brentwood Homes, LLC v. Town of Collierville*, 144 F. App'x 506, 510 (6th Cir. 2005).

For the savings statute to apply, "[i]t is not necessary that the two complaints be identical, only that the allegations arise out of the same transaction or occurrence." *Foster*, 158 S.W.3d at 422 (citing *Energy Sav. Prods.*, 737 S.W.2d at 784–85). The Sixth Circuit has held that, where appropriate, the savings statute can be applied to a § 1983 claim, despite the fact that the earlier-

filed complaint included only state-law torts, if the "same transaction or occurrence" requirement is met. *See Moore v. Fields*, 464 F.2d 549, 550 (6th Cir. 1972). Bohler's state-court complaint focused, in large part, on his history of feuding with Stockdale, Dunning, and Cox and his allegations that, in the course of their intradepartmental battles, Stockdale, Dunning, and Cox defamed him. (Docket No. 35-1 ¶¶ 8–58.) It did, however, also address the events surrounding his alleged constructive termination, which form the core of his claims against the City of Fairview in this court. (*Id.* ¶¶ 56–73.) Bohler filed his state-court complaint a month and a half after his alleged constructive discharge, and it is undisputed that his claims were, at that point, timely. Those claims were voluntarily dismissed on August 4, 2017 (Docket No. 35-2), and he filed his federal complaint on October 15, 2017, well within a year of that non-merits dismissal (Docket No. 1). If, therefore, Bohler had raised the savings statute at the appropriate time, the court likely would have moved on to consider whether his claims against the City should have been dismissed on other grounds. The court will proceed to that analysis at this point.

### 2. Merits: Claim for Violation of Procedural Due Process

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The due process clause has both procedural and substantive components." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). To establish a § 1983 claim for a violation of procedural due process, a plaintiff "must allege facts showing (1) that he was deprived of a constitutionally protected liberty or property interest; and (2) that he did not receive the required process." *Bright v. Gallia Cty.*, 753 F.3d 639, 656 (6th Cir. 2014) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 54 (1985); *Leary v. Daeschner*, 228 F.3d 729, 741–42 (6th Cir. 2000)).

Bohler premises his claim that the City of Fairview violated his right to procedural due process on his alleged property interest in his continued employment, which he lost, he argues, through constructive discharge culminating in his resignation. (Docket No. 1 ¶ 156.) For an employer's conduct "[t]o constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit[,] and the employee must actually quit." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). When analyzing working conditions, relevant factors include:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's*, 259 F.3d 558, 569 (6th Cir. 2001) (citation omitted).

According to his Complaint, on October 11, 2016, Bohler "typed and submitted a grievance via email to Interim Chief Smith" and "emailed copies of his grievance and a recording of the meeting to Mayor Carroll, Commissioner Crutcher and Commissioner Bissell." (Docket No. 1 ¶ 124.) That grievance concerned the possibility that Bohler's position was being eliminated in an upcoming reorganization and that he would, therefore, be demoted and face a reduction in salary. (*Id.* ¶¶ 123–125.) City Manager Collins scheduled a grievance hearing for October 13, 2016. (*Id.* ¶ 126.) When Bohler learned who would be presiding over the hearing, he chose instead to resign rather than face what he considered a biased panel: "Plaintiff realized that he was going to be denied due process in the matter. Faced with a demotion, a $10,000 pay cut, and deliberate assignment into a retaliatory and hostile environment, Plaintiff was forced to resign from the Fairview Police Department." (*Id.* ¶ 128.)

The facts that Bohler has alleged, read in the light most favorable to him, are sufficient to support a claim of constructive discharge, particularly in light of the apparent threat that his continued employment would be at a lesser rank and salary. He has, therefore, alleged a deprivation of a property interest, at least insofar as he can ultimately establish that he possessed such an interest in his employment, which the City does not presently dispute. In order for Bohler's claim to survive, however, he must also allege facts sufficient to establish the second element of a procedural due process claim—a denial of the procedures required for the government to deprive him of that property interest.

Bohler's Complaint is replete with claims that he was treated unfairly in various ways—with regard to disciplinary investigations against him, with regard to the enforcement of FPD's social media policies, and with regard to the FPD's interpretation of its nepotism rules, to name just a few. What Bohler was required to allege, however, was not some general environment of unfairness, but a denial of due process with regard to the deprivation of the specific property or liberty interest on which his claim was based. Bohler's numerous complaints—up to and including those regarding the grievance hearing—all involved injuries, real or hypothetical, other than the loss of his job. For example, Bohler may argue that he was not going to be afforded due process with regard to his potential demotion and loss of salary, but he was never actually demoted and his salary, never actually reduced. He may allege that investigations into his alleged wrongdoing were unfair, but he was never disciplined in a way that could form the basis of a deprivation of a property interest under the 14th Amendment. The deprivation that is alleged to have *actually* occurred was his constructive termination based on the cumulative circumstances he faced, including, but not limited to, the never-realized threat of a demotion. Bohler, therefore, was required to plead facts establishing a denial of the procedures due to an employee faced with a constructive discharge.

Some courts have suggested that, at least generally speaking, a public employee's resignation "'foreclose[s]' [him] from 'seek[ing] the protections of [his] previous rights as an employee" and that, therefore, any "claim that [he] was not given procedural rights to which [he] was entitled accordingly must fail." *Richardson v. New York City Bd. of Educ.*, 711 F. App'x 11, 14 (2d Cir. 2017) (*quoting Finley v. Giacobbe*, 79 F.3d 1285, 1296 (2d Cir. 1996)). The Sixth Circuit, however, has acknowledged that an individual alleging constructive discharge may be able to make out a claim for deprivation of procedural due process related to that discharge. *See Nunn v. Lynch*, 113 F. App'x 55, 60 (6th Cir. 2004). Even if some due process rights apply in such cases, however, the fact that the employee faced a constructive discharge, rather than an official termination, may affect the type of process that is practicable or even possible. A constructive discharge is, by its nature, informal; what is happening at the surface, on a formal level, conceals what is happening underneath—namely, that a person is being fired without his employer's ever acknowledging as much. The *sub rosa* nature of the termination will, at least in many cases, make constructive discharge an ill fit to the typical model of a pre-deprivation notice and hearing. It does not seem feasible, after all, to expect an employer to provide notice and a hearing to an employee about that employee's own resignation. The Sixth Circuit, accordingly, has recognized that, generally speaking, if an employee's "resignation was a constructive discharge, he arguably ha[s] a right to a *post*-deprivation hearing." *Nunn*, 113 F. App'x at 60 (emphasis added); *see also Hoover v. Cty. of Broome*, 340 F. App'x 708, 711 (2d Cir. 2009) (endorsing rule that "only a post-deprivation remedy [is] practical where the employee allege[s] a coerced resignation" (citing *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984)). *But see Jefferson v. Jefferson Cty. Pub. Sch. Sys.*, 360 F.3d 583, 587 (6th Cir. 2004) (assuming "for purposes of this appeal that [a] five-day

suspension without pay and coerced retirement constitute the deprivation of a property interest requiring a preloss hearing").

None of Bohler's allegations suggests that he sought or was denied any post-deprivation review of his termination. Instead, he would have the court take the alleged procedural violations associated with the deprivation that did not occur—his demotion and reduction in salary—and impute them to the deprivation that allegedly did, his termination. He has not, however, identified any legal basis for doing so. The court, therefore, would dismiss his procedural due process claim, even if timely filed.

### *3. Merits: Claim for First Amendment Retaliation*

A cause of action for First Amendment retaliation requires an employee to demonstrate that: "(1) [he] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Mills v. Williams*, 276 F. App'x 417, 418 (6th Cir. 2008) (citing *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). Public employees such as Bohler generally have "no right to object to conditions placed upon the terms of employment—including those which restrict[] the exercise of constitutional rights," but "[t]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)); *accord Keeling v. Coffee Cty.*, 541 F. App'x. 522, 526 (6th Cir. 2013). Accordingly, the Sixth Circuit has held that a public employee's speech is constitutionally protected if (1) in making the speech, the employee was speaking as a citizen, and not as a public employee acting in furtherance of his ordinary

responsibilities; and (2) the speech was on a matter of public concern. *Boulton v. Swanson*, 795 F. 3d 526, 531–32, 534 (6th Cir. 2015). The question of whether a public employee engaged in constitutionally protected speech is a question of law that is determined by the court. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017).

Bohler has argued that he made public statements on matters of public concern, particularly the allegedly pervasive wrongdoing among some members of the FPD, and was retaliated against because of it. The City of Fairview's only argument in support of a judgment on the pleadings in its favor with regard to First Amendment retaliation based on Bohler's constructive discharge was that his claim was untimely. (Docket No. 96 at 10.) Because that constructive termination was a key part of his state-court-lawsuit, however, Bohler was entitled to rely on the savings statute to render his otherwise untimely claim timely. Several individual parties convincingly disputed the application of Bohler's First Amendment retaliation claim to them, either because he alleged no facts meaningfully tying them to any retaliatory actions or because the facts he did allege did not rise to the level of an adverse action. The City, however, has made no such argument. A constructive termination would clearly be sufficient to form the basis of a retaliation claim, and Bohler has alleged facts supporting an inference that he was effectively coerced into resigning in retaliation for his having raised public concerns about wrongdoing in the department. Outstanding issues may exist with regard to whether Bohler's statements were made in the furtherance of his responsibilities, but he has pled at least some facts to the contrary, and the City based its argument on timeliness, not the merits. Accordingly, the court would not have dismissed this aspect of his claim against the City.[2]

---

[2] Bohler also has suggested that he was subject to retaliation in the form of the allegedly unlawful receipt of his personnel record by Terry Amonette. As the court explained in its earlier Memorandum, the release of Bohler's personnel record appears very likely to have been a lawful—and, indeed, legally required— response to a Public Records Act request. (Docket No. 115 at 27–30.) In any event, as the court has already

### *4. Merits: Equal Protection Claim*

Bohler's § 1983 claim under the Equal Protection Clause against the City would fail for the same reasons that the court held it to fail against Russell in its earlier Memorandum: he relies on a theory of equal protection that does not apply to employment decisions. (Docket No. 115 at 24–25.) Generally speaking, "[t]he Equal Protection Clause prohibits discrimination by the government that '[1] burdens a fundamental right, [2] targets a suspect class, or [3] intentionally treats one differently than others similarly situated without any rational basis for the difference.'" *Superior Commc'ns v. City of Riverview, Mich.*, No. 17-1234, 2018 WL 651382, at *10 (6th Cir. Feb. 1, 2018) (quoting *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty.*, 430 F.3d 783, 788 (6th Cir. 2005)). Where the "third kind" of equal protection violation is based on the singling out of the plaintiff alone, it is typically referred to as a "'class-of-one' violation." *Id.* (quoting *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 832 (6th Cir. 2009)). The "class-of-one theory of equal protection," however, "does not apply in the public employment context." *Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 607 (2008). Bohler has not made any meaningful effort to refute arguments that his "class of one" argument fails here. Accordingly, the court would dismiss that claim, even if timely filed. Bohler has established that only one federal claim against the City would survive on the merits: his claim for First Amendment retaliation.

### B. Claims Against Individual Defendants

As Bohler concedes, the only defendant for whom he can rely on the savings statute to insulate his § 1983 claims is the City of Fairview. He has not raised § 1983 claims against the individual defendants who were included in the state-court case, and the individuals against whom he has asserted § 1983 claims were added, for the first time, in this case. He argues, however, that

---

held, the release of the records is not a sufficient basis for stating a claim of First Amendment retaliation. (*Id.* at 29–30.) Bohler does not dispute that aspect of the court's earlier ruling in his present motion.

the court clearly erred by dismissing the claims against some of those individual defendants—namely Patti Carroll, Shannon Crutcher, Stewart Johnson, and Toney Sutton, also known as the "Commissioner Defendants"—because the accrual of the statute of limitations against those defendants was delayed by their fraudulent concealment of their involvement in the "wrongful scheme" against Bohler. (Docket No. 119 at 2.) As with the savings statute, Bohler concedes that he never raised this argument in his original briefing. In his Response to the Commissioner Defendants, as in his Response to the City, Bohler merely argued for later dates of accrual—arguments that Bohler's new counsel does not argue that the court erred in rejecting.

"The law of limitations [in a § 1983 case] focuses on the event that caused [the plaintiff's] harm, not on the identity of the perpetrator of the harm." *Clardy v. Bicigo*, No. 12-cv-11114, 2012 WL 5986630, at *3 (E.D. Mich. Nov. 29, 2012). "Federal procedural law provides that a plaintiff need not be aware of every detail or person involved in causing his injury for the limitations period to commence." *Easterly v. Budd*, No. 4:06-cv-00186, 2006 WL 2404143, at *8 (N.D. Ohio Aug. 18, 2006) (citation omitted). "Accrual simply does not await identification of a particular wrongdoer." *Marksbury v. Elder*, No. 5:09-cv-24-REW, 2011 WL 1832883, at *4 (E.D. Ky. May 12, 2011) (citation omitted). Accordingly, Bohler's alleged ignorance of the individual Commissioner Defendants' involvement in the scheme against him would not, in of itself, affect the tolling or running of the statute of limitations. Bohler argues, however, not only that he was ignorant of the Commissioners Defendants' involvement in the underlying illegal actions against him, but that those defendants affirmatively and fraudulently concealed that involvement.

As a preliminary matter the court notes that, despite Bohler's argument that the Commissioner Defendants' fraudulent concealment delayed accrual, the Sixth Circuit has treated fraudulent concealment in § 1983 cases as a doctrine related to tolling, not accrual. *See Guy v.*

*Lexington-Fayette Urban Cty. Gov't*, 488 F. App'x 9, 18 (6th Cir. 2012); *Drake v. City of Detroit, Mich.*, 266 F. App'x 444, 448–49 (6th Cir. 2008); *Dowdy v. Prison Health Servs.*, 21 F. App'x 433, 435 (6th Cir. 2001); *Jarrett v. Kassel*, 972 F.2d 1415, 1428 (6th Cir. 1992). In many cases, that distinction may be academic and unimportant. In a § 1983 case, however, the distinction is essential to determining which law governs. Accrual, as the court has discussed, is governed by federal law; tolling, on the other hand, is treated as part of the statute of limitations itself and is therefore governed by state law, as long as the relevant state's rules "are not 'inconsistent with federal law or policy.'" *Roberson v. Macnicol*, 698 F. App'x 248, 250 (6th Cir. 2017) (quoting *Johnson*, 777 F.3d at 845).

Under Tennessee law, a claim of fraudulent concealment asserted to toll the running of the statute of limitations contains four elements:

> (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry.

*Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 462–63 (Tenn. 2012) (citations and internal quotation marks omitted).

In support of his fraudulent concealment argument, Bohler has submitted a Declaration in which he describes learning, in June 2017, that the Commissioner Defendants had been involved in initiating a 2016 Williamson County Sheriff's Office ("WCSO") investigation of the FPD. (Docket No. 119-1 ¶ 2.) He alleges that the Commissioner Defendants concealed their involvement in the WCSO investigation by denying that involvement both publicly and to Bohler himself. (*Id.* ¶ 9.) His attempts to tie the Commissioner Defendants' involvement in the WCSO investigation

to his own alleged injuries, however, are decidedly tenuous. Bohler has not alleged that the WCSO investigation was the reason for his constructive termination. He was merely unhappy with the results, which he believed gave short shrift to some of the allegations against other FPD officers with whom he had been feuding. (Docket No. 1 ¶¶ 102–05.) He attempts to tie the allegedly concealed involvement in the WCSO investigation into his own claims as follows:

> The admission about the Board's involvement was important because much of my lawsuit already concerned the malicious nature of the Sheriff's investigation. I already possessed numerous items of evidence about the twisted nature of that investigation. But until Crutcher admitted the Board's involvement, I was under the impression that the Board members were uninvolved. In fact, because of their deliberate deception, I was under the faulty impression that Board members (Crutcher especially) were actually on my side during the dispute about my constructive discharge.

(Docket No. 119-1 ¶ 8.) As has so often been the case in this litigation, Bohler appears to be confusing the broad category of circumstances he feels wronged about with the narrower category of what he has actually sued for. In order for fraudulent concealment to apply, the Commissioner Defendants would have to have (1) concealed Bohler's injuries, which it is agreed they did not, (2) concealed that they were responsible for those injuries, or (3) withheld some material fact that they had a duty to disclose. At most, though, Bohler has alleged that the Commissioner Defendants concealed the nature and extent of their involvement in a matter with only a tangential relationship to Bohler's actual constructive discharge.

The Commissioner Defendants' connection to Bohler's alleged constructive discharge, however, has never been particularly concealed. Bohler has consistently maintained that his constructive discharge culminated with his denial of an unbiased panel with regard to his demotion-related grievance. Among the allegedly biased panelists whom Bohler has identified were Mark Sutton and Codes Director Wayne Hall. (Docket No. 1 ¶ 126.) Prior to his panel's being announced, Bohler had emailed copies of his grievance to Commissioner Defendant Carroll and

Commissioner Defendant Crutcher, and both had declined to intercede on his behalf. (*Id.* ¶ 124.) Bohler's Complaint, moreover, alleges that the Commissioner Defendants first started publicly protecting Mark Sutton no later than August 16, 2016—months before the alleged constructive discharge. (*Id.* ¶ 116.) Hall's alleged bias was merely that he was a close personal friend of Commissioner Defendant Toney Sutton. (*Id.* ¶ 126.) In other words, before his constructive discharge even occurred, Bohler knew that (1) at least two of the Commissioner Defendants had been made aware of his grievance and had done nothing to protect or assist Bohler; (2) the Commissioner Defendants had used their authority to protect one of the allegedly biased panelists in the recent past; and (3) another Commissioner Defendant was so hostile to Bohler that the very presence of one of that Commissioner's friends on the panel created an unfair process. Those facts provided much more reason to suspect the Commissioner Defendants' involvement than the tenuously relevant fact that they were involved in the wholly separate WCSO investigation. That the Commissioner Defendants may have concealed some secondary facts is not enough to support a claim of fraudulent concealment, let alone establish that clear error or manifest injustice occurred when the court declined to raise the argument *sua sponte*. The court, therefore, will not revive the § 1983 claims against the Commissioner Defendants.

## C. Application of Rule 59 to the Federal Claims

Bohler has demonstrated that his claims against the City of Fairview were not, in fact, untimely, although he has failed to do so with regard to any other defendant. He has also shown that, while some of the federal claims he pled against the City were insufficient on the face of his Complaint, one of those claims was sufficient to survive a motion to dismiss or motion for judgment on the pleadings. Merely showing that a party would have prevailed on an argument it failed to raise is, as the court has explained, not typically a sufficient ground to alter or amend a

judgment under Rule 59(e). Some additional contextual factors, however, support the conclusion that a manifest injustice would result if Bohler were not allowed to proceed here. First is that, even without the savings statute, he was untimely by such an extraordinarily short period of time. The statute of limitations, regardless of the savings statute, would have given him until October 13, 2017, to file his Complaint. He filed it on October 15, 2017. His alleged delay, in other words, was no longer than occurs when a deadline happens to fall on a Saturday. The unforgiving nature of statutes of limitations sometimes requires such barely-late claims to fail, as Bohler's § 1983 claims against the Commissioner Defendants do. Such an outcome is hard to justify, however, when the plaintiff's claim was not even actually untimely.

Also supporting a finding of manifest injustice is that, while Bohler's prior counsel did not raise the savings statute, that counsel did make the court aware of the earlier litigation. The court, therefore, which has considered Tennessee's savings statute on numerous occasions, could have noted that the statute likely applied here, but it did not. Bohler's opposing counsel also could have made such an observation and did not. While neither the court nor opposing counsel was under any obligation to assist Bohler's counsel, the court accepts its share of responsibility for the fact that this issue was not identified sooner.

Finally, the court notes that claims of the type asserted by Bohler do not merely protect the material interest of the plaintiff. The ability of public servants to participate, as citizens, in the democratic process by addressing issues that they are uniquely suited to understand and identify benefits all of society. Any error by Bohler's counsel to preserve his claims therefore threatened to harm not only Bohler but every person in Fairview who would benefit from living in a city where police can speak out against misconduct without fear of improper reprisal. The court, accordingly, will grant Bohler's motion and amend its order of dismissal with regard to his First

Amendment retaliation claim against the City of Fairview and his claim that the City of Fairview engaged in conspiracy to engage in First Amendment retaliation. All of his other federal claims, however, will remain dismissed, either because they were untimely or because they would fail on the merits.

## II. State Law Claims

The court explained its decision to decline to exercise supplemental jurisdiction over Bohler's numerous state law claims as follows:

> In the absence of Bohler's constitutional claims, this case is fundamentally about conflicts between various employees and officers of a Tennessee local government and whether one of those employees, Bohler, was afforded the protections to which he was entitled under Tennessee law. The court sees no reason that the federal courts are the forum best suited for consideration of those matters. Accordingly, the court will decline to exercise jurisdiction over the state law claims and will dismiss those claims without prejudice.

(Docket No. 115 at 31.) That opening clause, however, no longer applies; Bohler now has at least one remaining federal claim. The resurrection of that claim, moreover, removes the statutory ground for declining to exercise jurisdiction on which the court relied. *See* 28 U.S.C. § 1367(c)(3). The court, therefore, must consider anew whether and how to address Bohler's state law claims.

Bohler has pled six state law claims. His Complaint is not, in every instance, clear with regard to which claims are directed at which defendants. It appears, however, that the claims are as follows:

| Count | Cause of Action | Defendants |
|-------|-----------------|------------|
| V | TPPA | The City and the Commissioner Defendants |
| VI | Defamation | Stockdale, Dunning, and Cox |

| VII | Unlawful Invasion of Privacy | Amonette, Collins, Zach Humphreys, Brandy Johnson[3] |
| VIII | Official Oppression | "Defendants" |
| IX | Tampering with or Fabricating Evidence | Amonette, Collins, Humphreys, Johnson |
| X | Intentional Interference with Employment | All defendants except Collins |

## A. Tennessee Public Protection Act

The TPPA creates a cause of action for an employee if he is discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b)–(c). The TPPA only creates a cause of action against an "employer." Tenn. Code Ann. § 50-1-304(c). Accordingly, insofar as Bohler intended to assert TPPA claims against the Commissioner Defendants in their individual capacities, those claims would fail, because they did not employ him. Insofar as he asserts claims against them in their official capacities, "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents." *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *see also Frost v. Hawkins Cty. Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988). Those claims, accordingly, will be subject to the same analysis as Bohler's TPPA claim against the City.

"Claims for retaliatory discharge under the TPPA must be brought within one year of discharge from employment." *Gibson-Holmes v. Fifth Third Bank*, 661 F. Supp. 2d 905, 912 (M.D. Tenn. 2009) (citing *Farmer v. Tenn. Dep't of Safety*, 228 S.W.3d 96, 98 (Tenn. Ct. App. 2007)). The defendants argue that, even if the court allows Bohler to raise the savings statute, it should

---

[3] Bohler voluntarily dismissed his claims against Zach Humphreys and Brandy Johnson on January 5, 2018. (Docket No. 63.)

dismiss his TPPA claims as untimely on the ground that, as the Tennessee Court of Appeals has held, the savings statute does not apply to the TPPA. *See Clark v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2016-01014-COA-R3-CV, 2017 WL 1224703, at *2 (Tenn. Ct. App. Apr. 3, 2017); *Farmer*, 228 S.W.3d at 101. Bohler concedes that "the Tennessee courts might not look kindly on use of the savings statute to save a state TPPA claim against a city government" (Docket No. 131 at 5), but nevertheless urges the court to consider the possibility that the Court of Appeals may be mistaken.

"When resolving an issue of state law," a federal court must "look to the final decisions of that state's highest court, and if there is no decision directly on point, then [it] must make an *Erie* guess[4] to determine how that court, if presented with the issue, would resolve it." *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)). If the state's highest court has not spoken on an issue, but its intermediate appellate courts have, the federal court "should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).

Bohler suggests that the Court of Appeals' rulings conflict with *Sneed v. City of Red Bank*, 459 S.W.3d 17 (Tenn. 2014), in which the Tennessee Supreme held that certain procedural requirements under Tennessee's Governmental Tort Liability Act did not apply to the TPPA. *Id.* at 28–29. The Court of Appeals' rulings in the savings statute cases, however, were not premised on the assumption that TPPA claims are subject to the statutory procedural requirements of the GTLA. Rather, the Court of Appeals concluded that, in enacting the savings statute, the General

---

[4] "*Erie* guess" refers to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

Assembly did not waive sovereign immunity against governmental entities. Indeed, the Court of Appeals has reiterated its rule and applied it to a local government defendant in the years since *Sneed*. *See Clark*, 2017 WL 1224703, at *3. Bohler, as he seems ultimately to acknowledge, has not identified a sufficient basis for departing from the Court of Appeals precedents declining to apply the savings statute to the TPPA. The court, accordingly, will dismiss Count V.

**B. Defamation**

1. Supplemental Jurisdiction

Stockdale, Dunning, and Cox argue that the court should dismiss the defamation claims against them, either because those claims are not properly subject to supplemental jurisdiction, or because the court should, within its discretion, decline to exercise that supplemental jurisdiction over state law claims that bear only a tangential relationship to the claims over which the court has original jurisdiction. Bohler responds that his claims against Stockdale, Dunning, and Cox are properly before the court, because their defamatory statements and intent were inextricably entwined with the events culminating in the constructive discharge giving rise to his federal claims.

A district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's'] original jurisdiction that they form part of the same case or controversy." *Carmichael v. City of Cleveland*, 571 F. App'x 426, 434 (6th Cir. 2014) (quoting 28 U.S.C. § 1367(a)). Claims form part of the same case or controversy when they "derive from a common nucleus of operative fact." *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). Even where supplemental jurisdiction exists, however, the court may decline to exercise supplemental jurisdiction for the following reasons:

(1)       the claim raises a novel or complex issue of State law,

(2)      the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)      the district court has dismissed all claims over which it has original jurisdiction, or

(4)      in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c); *see also Baer v. R & F Coal Co.*, 782 F.2d 600, 603 (6th Cir. 1986) ("[P]endant jurisdiction is a doctrine of discretion, not of plaintiff's right.") (quoting *United Mine Workers*, 383 U.S. at 726). District courts generally have broad discretion in deciding whether to decline or elect to exercise supplemental jurisdiction over state law claims. *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) (citing *Transcon. Leasing, Inc. v. Mich. Nat'l Bank of Detroit*, 738 F.2d 163, 166 (6th Cir. 1984)), *amended by, and reh'g en banc denied*, 1998 WL 117980 (6th Cir. Jan. 15, 1998).

The core of Bohler's constructive discharge argument is that the City of Fairview and the Fairview Police Department placed him in a position so untenable that, although he was not formally fired, his ostensibly voluntary resignation was the equivalent of a termination. The assumption underlying that argument is that the cards had been stacked so unfairly and conclusively against him that he had no reasonable expectation that he would be vindicated or protected through the ordinary processes reserved for considering employee grievances and/or allegations of wrongdoing. Bohler's struggles against Stockdale, Dunning, and Cox were central to the events that culminated in Bohler's being placed in such an allegedly untenable position. Bohler—who, at one time, was on the verge of leading the department, at least on an interim basis—later found himself under intense scrutiny, facing a demotion and pay reduction, and placed before a grievance panel that, he believed, included established enemies of his. That downward trajectory reflected Bohler's apparently waning goodwill and credibility within the FPD and city

government—an alleged result, at least in part, of a defamatory campaign against him by Stockdale, Dunning, and Cox. The court, accordingly, finds that it has supplemental jurisdiction over the defamation claims, because they arise out of the same core of operative facts as his constitutional claims arising out of his alleged constructive discharge and the violation of his First Amendment rights.

Moreover, the court sees no reason why it should decline to exercise that supplemental jurisdiction here. These claims do not fall into any of the statutorily identified situations in which declining to exercise jurisdiction would be justified, and interests of judicial economy would seem to favor considering the claims together. Admittedly, Bohler's theory of the case is relatively expansive, and the defendants raise reasonable concerns about side vendettas getting caught up in what could, in the alternative, be a much more narrowly conceived public employment case. The court fails to see, however, what legitimate interests would be served by complicating matters further by necessitating parallel state court litigation—insofar as that would even be an option at this point—as long as the exercise of federal jurisdiction is constitutionally and statutorily permissible. The court, accordingly, will exercise its supplemental jurisdiction over the claims against Stockdale, Dunning, and Cox.[5]

2. Tennessee Governmental Tort Liability Act

Stockdale, Dunning, and Cox argue next that the defamation claims against them are barred by the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. § 29-20-101 *et*

---

[5] In support of their argument that the court should decline to exercise supplemental jurisdiction, Stockdale, Dunning, and Cox provide what appears to be a scan of a printed screenshot of a Facebook message from Bohler, suggesting that the state court filing was a "ruse designed to observe reactions and uncover evidence" and that the "[c]ase was going federal the whole time." (Docket No. 33-2.) Insofar as that message is a full and accurate representation of Bohler's strategy, it would seem to suggest a troubling use of the state court system, which no doubt has its share of earnestly filed cases to resolve. Nevertheless, the court will not decline to exercise jurisdiction based solely on one seemingly offhand remark by the plaintiff.

*seq*. Bohler responds that the actions of Stockdale, Dunning, and Cox are not shielded by the GTLA because his defamation claims are raised against them in their individual capacities.

The GTLA provides that governmental entities are immune from lawsuits arising from the exercise or discharge of their governmental or proprietary functions, with certain exceptions. Tenn. Code Ann. § 29-20-201(a). One of the exceptions to this general rule provides that governmental entities are generally not immune where a plaintiff's injuries result from the negligence of a governmental employee. Tenn. Code Ann. § 29-20-205. However, the GTLA expressly retains immunity from suit for injuries arising out of a number of specified intentional torts, including "false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights." Tenn. Code Ann. § 29–20–205(2).

"When a suit is brought against a police officer in his official capacity, it is actually a suit against the government entity. Therefore, in circumstances where GTLA immunizes a governmental entity, it follows that an officer is also immune when sued in his official capacity." *Olivier v. City of Clarksville*, No. M2016-02473-COA-R3-CV, 2017 WL 3535016, at *5 (Tenn. Ct. App. Aug. 17, 2017) (quoting *Crowe v. Bradley Equip. Rentals & Sales, Inc.*, No. E2008–02744–COA–R3–CV, 2010 WL 1241550, at *4 (Tenn. Ct. App. Mar. 31, 2010)). "[H]owever, the immunity afforded governmental entities does not extend to the employee" in his individual capacity. *Hughes v. Metro. Gov't of Nashville & Davidson Cty.*, 340 S.W.3d 352, 359 n.3 (Tenn. 2011) (citing *Fann v. City of Fairview*, 905 S.W.2d 167, 174 (Tenn. Ct. App. 1994)).

The Complaint indicates generally that Bohler is raising claims against the defendants in both their individual and official capacities, and the specific allegations underlying Bohler's

defamation claims involve communications that, though related in varying degrees to police business, are nevertheless attributable to Stockdale, Dunning, and Cox as individuals. *See Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (explaining "course of proceedings" test for identifying individual capacity claims). Moreover, while Bohler devotes a significant amount of briefing to the question of whether Stockdale, Dunning, and Cox were acting within the scope of their duties when they allegedly defamed him, the court notes that an individual capacity suit is not categorically precluded merely because a defendant was "acting within the general ambit of his job title" when he committed his tortious actions. *Ritchie v. Wickstrom*, 938 F.2d 689, 692 (6th Cir. 1991).

Stockdale, Dunning, and Cox merely allege, without citation to authority, that the GTLA wholly immunizes them from liability for defamation because "most of the allegations . . . occurred while [they] were acting in the course of their employment, or under color or uniform." (Docket No. 33 at 7.) They have identified no basis for such broad individual immunity. The court, accordingly, will not dismiss the individual-capacity defamation claims based on GTLA immunity.

### 3. Absolute Litigation Privilege

Next, Stockdale, Dunning, and Cox argue that two classes of communications on which Bohler seeks to base his defamation claims are protected by Tennessee's testimonial privilege— also sometimes known as "litigation privilege": (1) the affidavit testimony made by Stockdale and Dunning as part of their federal case for retaliatory discharge; and (2) communications by Stockdale, Dunning, and Cox in the course of investigating whether Bohler falsified time records or violated the department's leave policies.

Tennessee recognizes "two types of privileges that can be raised as a defense in a defamation case, absolute and qualified." *Simpson Strong-Tie Co. v. Stewart, Estes & Donnell*,

232 S.W.3d 18, 22 (Tenn. 2007) (citing *Jones v. Trice*, 360 S.W.2d 48, 51 (Tenn. 1962)). If a privilege is absolute, it "is, in effect, a complete immunity." *Id.* (citing *Jones*, 360 S.W.2d at 51; Dan B. Dobbs, The Law of Torts 1153 (2000)). Tennessee courts have recognized an absolute litigation privilege, whereby "defamatory statements by a judge, witness, counsel, or party 'made in the course of a judicial proceeding, if pertinent or relevant,'" cannot form the basis of a defamation claim, "regardless of whether they are malicious, false, known to be false, or against a stranger to the proceeding.'" *Id.* at 23 (quoting *Jones*, 360 S.W.2d at 54). Bohler does not dispute that the affidavit statements of Dunning and Stockdale were made in the course of a judicial proceeding, but he argues that they are not protected because the statements were not "pertinent or relevant" to that proceeding.

In their federal case, Stockdale and Dunning alleged that they were terminated in retaliation for their exercise of their First Amendment rights in criticizing the department's allegedly inappropriate relationship with APEX Security Group. In support of their contention that city decision makers acted out of a vendetta against them, Stockdale and Dunning alleged that the city declined to punish Bohler for threatening them in violation of department and city policies. Tolerating another officer's harassment of Stockdale and Dunning, they argued, established that the leadership of the department held ill will toward them. Such an allegation easily exceeds the "low threshold" for relevance under Tennessee law. *State v. Combs*, Nos. E2000-02801-CCA-R3-CD, E2000-02800-CCA-R3-CD, 2002 WL 31118329, at *50 (Tenn. Crim. App. Sept. 25, 2002); *cf. Cambio Health Sols., LLC v. Reardon*, 234 F. App'x 331, 338 (6th Cir. 2007) (noting that the similar federal standard for relevance "set[s] a low bar").[6] A fact is relevant in Tennessee if it

---

[6] The court looks to the Tennessee definition of relevance because it is applying an exception to a Tennessee cause of action. The same analysis would apply, however, if the court relied on the federal definition of relevance.

"ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without" that fact. Tenn. R. Evid. 401. If the city did, in fact, tolerate one of its detectives' threatening of Stockdale and Dunning, that toleration would be at least mildly corroborative of an inference that city officials held an improper animus toward Stockdale and Dunning, which would, in turn, be relevant to the question of retaliation.[7] The affidavits are protected by litigation privilege.

The other officers' statements regarding Bohler's time records and use of leave, on the other hand, were not made in the course of any particular judicial proceeding. They argue that such statements are nevertheless protected because Tennessee has extended the testimonial privilege to statements made in advance of anticipated litigation, *see Unarco Material Handling, Inc. v. Liberato*, 317 S.W.3d 227, 238 (Tenn. Ct. App. 2010), as well as those made in quasi-judicial administrative proceedings, *see Tabor v. Eakin*, No. 03A01-9902-CV-00043, 1999 WL 330318, at *3 (Tenn. Ct. App. May 26, 1999) (citing *Lambdin Funeral Serv., Inc. v. Griffith*, 559 S.W.2d 791, 792 (Tenn. 1978)).

It is certainly possible that some statements about police wrongdoing, made in advance of an identifiable, anticipated disciplinary proceeding, would be protected on such grounds. Whether that is the case here, however, is a question of fact that the court cannot resolve on a motion to dismiss. Nothing in the Complaint suggests that the defendants' allegations about sick leave and time records were limited to settings related to a particular anticipated proceeding. (*See* Docket No. 1 ¶¶ 74–75, 83, 87.) If the statements were made simply to impugn Bohler's credibility, damage his reputation in the department, or make him a less attractive candidate for promotions—

---

[7] It is worth noting that this argument—that the FPD's failure to discipline one's tormentors is evidence of a departmental conspiracy—is an argument that Bohler has made repeatedly in his briefing and pleading in this case.

without an eye to a particular anticipated proceeding—they are not protected by litigation privilege. *See Unarco*, 317 S.W.3d at 238 (recognizing limitations on litigation privilege for statements made prior to commencement of litigation). The court will not dismiss the defamation claims based on statements other than the affidavits on that ground.

## 4. Conditional Privilege

Similarly unavailing is the argument that Stockdale, Dunning, and Cox are entitled to dismissal because their statements are protected by the conditional privilege afforded to certain statements made in relation to issues of public interest. Tennessee courts have recognized closely related "common interest" and "public interest" privileges:

> Qualified privilege extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. . . . The rule announced is necessary in order that full and unrestricted communication concerning a matter in which the parties have an interest may be had. It is grounded in public policy as well as reason.

*Certain v. Goodwin*, No. M2016-00889-COA-R3-CV, 2017 WL 5515863, at *7 (Tenn. Ct. App. Nov. 17, 2017) (quoting *So. Ice Co. v. Black*, 136 Tenn. 391, 401 (1916)); *see also Pate v. Serv. Merch. Co.*, 959 S.W. 2d 569, 575–76 (Tenn. Ct. App. 1996) (discussing application of privilege to matters of public interest). That privilege, however, is premised on good faith. Bohler has alleged that Stockdale, Dunning, and Cox intentionally manufactured false allegations intended to discredit him and spread those allegations, despite knowing them to be false. Stockdale, Dunning, and Cox are therefore not entitled to dismissal based on conditional privilege.

## 5. Elements of Defamation

Stockdale, Dunning, and Cox argue, finally, that Bohler has failed to plead the elements of either slander or libel under Tennessee law. Under Tennessee law, both libel and slander are forms

of the tort of defamation. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994). To establish a defamation claim, a plaintiff must demonstrate that the defendant published a false and defamatory statement with knowledge of the statement's falsity, reckless disregard for the statement's truth, or negligence in failing to ascertain the statement's truth. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999); *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978) (citing Restatement (Second) of Torts § 580B (1977)). The particular state of mind that is required to sustain a defamation claim varies depending on the identity of the parties involved. *See West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001).

### a. Falsity

Stockdale, Dunning, and Cox argue, first, that the allegedly defamatory statements they made are not actionable because they were substantially true. Tennessee courts have held that the mere presence of technical, non-damaging inaccuracies alongside an otherwise truthful but damaging statement is not enough to establish defamation:

> The damaging words must be factually false. If they are true, or essentially true, they are not actionable, even though the published statement contains other inaccuracies which are not damaging. Thus, the defense of truth applies so long as the "sting" (or injurious part) of the statement is true. . . . [I]t is not necessary to prove the literal truth of [the] accusation in every detail. . . . [Instead,] it is sufficient to show that the imputation is substantially true, or, as it is often put, to justify the "gist," the "sting," of the "substantial truth" of the defamation.

*Aegis Scis. Corp. v. Zelenik*, No. M2012-00898-COA-R3CV, 2013 WL 175807, at *10 (Tenn. Ct. App. Jan. 16, 2013) (quoting *Stones River Motors, Inc. v. Mid–S. Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983)). By the same principle, "[m]ere hyperbole or exaggerated statements intended to make a point are not actionable defamatory statements." *Davis v. Covenant Presbyterian Church of Nashville*, No. M2014-02400-COA-R9-CV, 2015 WL 5766685, at *3

(Tenn. Ct. App. Sept. 30, 2015) (quoting *Farmer v. Hersh*, No. W2006-01937-COA-R3-CV, 2007 WL 2264435, at *5 (Tenn. Ct. App. Aug. 9, 2007)).

Bohler, however, has alleged that these defendants made statements that were false and damaging with regard to those statements' core content, not merely mistaken with regard to ancillary details. In particular, any claim that Bohler violated the department's time and leave policies or engaged in nepotism—if, in fact, he did not—would meet the threshold for falsity under Tennessee law.

Tennessee's recognition that "mere hyperbole" will not typically amount to defamation, moreover, is not a general license to propagate falsehoods as long as those falsehoods take the form of overstatement. Hyperbole is a rhetorical device premised on a contextual understanding that the facts asserted are not literally true, but instead reflect an inflation of the truth to convey emphasis, irony, or some other affective property.[8] *See Stones River Motors.*, 651 S.W.2d at 722 (observing that claims are not actionable where they "would be understood as mere 'rhetorical hyperbole'" (quoting *Fram v. Yellow Cab Co. of Pittsburgh*, 380 F. Supp. 1314, 1329 (W.D. Pa. 1974)). Without an appropriate context suggestive of rhetorical hyperbole, overstatement is just another species of falsehood and entirely appropriate for a defamation case if all other requirements are met. The court will not dismiss Bohler's defamation claims based on the theory that all of the accusations against him were substantially true, under a hyperbole theory or otherwise.

### b. Publication

The defendants argue next that Bohler cannot recover because their statements were not "published," as that term is used in the defamation context—that all of the underlying

---

[8] For example, it is hyperbole for a hungry person to tell his friends that he would pay a million dollars for a sandwich, when, in fact, he would pay no more than ten dollars. It would probably not be hyperbole if the same man told a prospective lender that his company had made a million dollars in profits last year, when, in fact, it had incurred only ten dollars more of revenues than expenses.

communications took place between members of the same organization, namely, the FPD. "Publication is a term of art meaning the communication of defamatory matter to a third person." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (quoting *Quality Auto Parts*, 876 S.W.2d at 821). "[P]ublication is an essential element of a [defamation] action without which a complaint must be dismissed." *Siegfried v. Grand Krewe of Sphinx*, No. W2002-02246-COA-R3CV, 2003 WL 22888908, at *2 (Tenn. Ct. App. Dec. 2, 2003) (quoting *Woods v. Helmi, M.D.A.*, 758 S.W.2d 219, 222–23 (Tenn. Ct. App. 1988)). Tennessee courts have held that certain "intra-corporate communications" do not constitute publication. *Woods*, 758 S.W.2d at 223. Accordingly, "where [a] communication is made to a servant or business associate in the ordinary and natural course of business, there is no actionable [defamation]." *Clark v. Hoops, LP*, 709 F. Supp. 2d 657, 671 (W.D. Tenn. 2010) (quoting *Freeman v. Dayton Scale Co.*, 19 S.W.2d 255, 256 (Tenn. 1929)).

Bohler does not dispute that the same rule would apply to some communications within the FPD, but he argues that the defendants are not entitled to the protection afforded intra-organizational communications because (1) some of their communications were made to people outside the police department and (2) the statements made to other police personnel were not made in the proper chain of command. Tennessee courts have stated that the rule protecting intra-corporate communications applies only to "communication flowing through the proper chain of command," such as in "employee performance reviews or disciplinary action." *Clark*, 709 F. Supp. 2d at 671 (quoting *Woods*, 758 S.W.2d at 223). What Bohler has alleged is a significantly more wide-ranging and proactive attempt to tear down his reputation in the department and in city government as a whole, including a meeting with Commissioner Crutcher, who was not a member of the FPD, and several communications whose relationship with the ordinary chain of command

is still an open question. It may be that a factual record will show that some, or even most, of the defendants' statements qualify as non-published intra-organizational communications. At this stage, however, Stockdale, Dunning, and Cox are not entitled to dismissal on that ground.

### c. Damages

Stockdale, Dunning, and Cox suggest next that the court should dismiss Bohler's defamation claims because Bohler did not suffer, or at least cannot prove that he suffered, any actual damages from the underlying statements. "[T]o establish any type of defamation claim, whether slander or libel, the claimant must prove that the defamation resulted in injury to the person's character and reputation." *Brown*, 428 S.W.3d at 50 (quoting *Quality Auto Parts*, 876 S.W.2d at 820). Damages "cannot be presumed" but must instead be based on "material evidence." *Id.* at 51 (quoting *Murray v. Lineberry*, 69 S.W.3d 560, 564 (Tenn. Ct. App. 2001)). Stockdale, Dunning, and Cox argue that Bohler cannot prove actual damages from their statements. That may turn out to be true, but, like many of these defendants' arguments, it is not a sufficient reason to dismiss under Rule 12(b)(6). Bohler is required only to plead a plausible account of how he was actionably defamed, and he has done so by explaining how the sustained effort to harm his reputation played a pivotal role in his falling out of favor in, and eventually being drummed out of, the FPD. Those alleged damages—whether he will ultimately be able to prove them or not— are sufficient to avoid dismissal.

### d. Malice

Finally, Stockdale, Dunning, and Cox argue that they are entitled to dismissal under Rule 12(b)(6) because Bohler allegedly cannot prove actual malice. In *New York Times v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court held that the First Amendment to the United States Constitution provides protection from defamation claims in certain circumstances. Under *New*

*York Times*, a public official may not recover on a defamation claim unless the allegedly defamatory statement was made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279. Actual malice, however, is exactly what Bohler has alleged. (See Docket No. 1 ¶¶ 75 ("Both Dunning and Cox knew that these allegations were false."), 87 (describing the same allegations being shared with Commissioner Crutcher)). Again, Stockdale, Dunning, and Cox, have misconstrued Rule 12(b)(6) as a mechanism to preemptively challenge the sufficiency of Bohler's evidence. Because his allegations, as pled, are sufficient and plausible, Bohler's claims will not be dismissed due to a speculative inability to establish malice as a matter of fact.

## C. Unlawful Invasion of Privacy

Bohler's claims for unlawful invasion of privacy against Amonette and Collins are premised on Amonette's allegedly unlawful accessing of Bohler's personnel file. The court notes, preliminarily, that, while the court's earlier Memorandum Order did not resolve any other state claims on the merits, it did grant Amonette summary judgment on all claims against him, both state and federal. (Docket No. 116 at 2.) Bohler has not identified any reason why that ruling was incorrect. Accordingly, all that remains is the count for unlawful invasion of privacy against Collins, over which the court previously declined to exercise jurisdiction. As the court has already ruled, however, Bohler's personnel file was a public record under Tenn. Code Ann. § 10-7-503, and Bohler has not set forth any facts that would establish that it was accessed unlawfully. The court, therefore, will dismiss this claim on the merits.

## D. Official Oppression & Tampering

As several defendants have pointed out, Bohler's Count VIII purports to assert a claim for official oppression in violation of Tenn. Code Ann. § 39-16-403, but Tenn. Code Ann. § 39-16-

403 is not, in fact, a civil statute creating a cause of action, but a criminal statute creating a class E felony based on certain intentional improper acts carried out by a public servant acting under color of law. Nothing in the text of the statute suggests that it confers a private right of action. Count VIII will, accordingly, be dismissed against all defendants.

Count IX, for tampering, fails for the same reason. Tenn. Code Ann. § 39-16-503 makes it a Class C felony to knowingly "[a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding" or "[m]ake, present, or use any record, document or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding." Bohler has identified no basis for reading a private cause of action into this criminal statute. Count IX, therefore, will be dismissed against all defendants.

## E. Intentional Interference with Employment

"The essential elements of a claim for intentional interference with employment are 'that the defendant intentionally and without justification procured the discharge of the employee in question.'" *Lyne v. Price*, No. W2000-00870-COA-R3-CV, 2002 WL 1417177, *2 (Tenn. Ct. App. June 27, 2002) (quoting *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977)). "A claim for intentional interference with employment 'contemplate[s] a three-party relationship— the plaintiff as employee, the corporation [or other entity] as employer, and the defendants as procurers or inducers.'" *Id.* (quoting *Nelson v. Martin*, 958 S.W.2d 643, 647 (Tenn. 1997)). If the defendant is a corporate director, officer, or employee of the original employer itself, then the plaintiff cannot establish intentional interference with employment unless that defendant was "acting outside the scope of his authority, acting with malice, or acting to serve his own interests"; otherwise, there is no three-party relationship on which to premise the claim. *Thompson v.*

*Memphis Light, Gas & Water*, 416 S.W.3d 402, 413 (Tenn. Ct. App. 2011) (quoting *Lyne v. Price*, No. W2000-00870-COA-R3-CV, 2002 WL 1417177, at *2–3 (Tenn. Ct. App. June 27, 2002)).

With regard to intentional interference with employment, Bohler's claims amount to little more than "[t]hreadbare recitals of the elements of a cause of action," devoid of "factual content that [would allow] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). He does not differentiate at all between the various defendants included, nor does he identify which acts, in particular, consisted of any individual's having procured his discharge. (Docket No. 1 ¶¶ 202–05.) To state a colorable claim, the Complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff cannot rely on a "blanket assertion . . . of entitlement to relief," but must plead facts sufficient to provide "fair notice" of both "the nature of the claim" and the "grounds on which the claim rests." *Id.* at 556 n.3 (citation and internal quotation marks omitted). Bohler has failed to do so. Count X, therefore, will be dismissed.

## CONCLUSION

For the foregoing reasons, Bohler's Motion to Alter or Amend Judgment (Docket No. 119) will be granted in part and denied in part. The Entry of Judgment of June 20, 2018 (Docket No. 117) will be set aside, and the court's Order of June 19, 2018 (Docket No. 116) will be amended to reflect that Bohler's § 1983 claim against the City of Fairview for First Amendment retaliation and his defamation claims against Stockdale, Dunning, and Cox have not been dismissed and that the other state claims have been dismissed on the merits.

An appropriate order will enter.

ENTER this 5th day of November 2018.

_____
ALETA A. TRAUGER
United States District Judge