| | | |
|---|---|---|
| **DAVID PAUL BOHLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-1373** |
| | ) | **Judge Aleta A. Trauger** |
| **CITY OF FAIRVIEW, TENNESSEE,** | ) | |
| **TIMOTHY SHANE DUNNING, and** | ) | |
| **JOSEPH COX,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Timothy Shane Dunning and Joseph Cox have filed a Motion for Summary Judgment (Docket No. 162), to which David Paul Bohler has filed a Response (Docket No. 180), and Dunning and Cox have filed a Reply (Docket No. 197). The City of Fairview has filed a Motion for Summary Judgment (Docket No. 167), to which Bohler has filed a Response (Docket No. 192), and Fairview has filed a Reply (Docket No. 203). Bohler has filed a Motion for Summary Judgment (Docket No. 172), to which the City, Dunning and Cox have filed Responses (Docket Nos. 183 & 189), and Bohler has filed a Reply (Docket No. 204). Finally, Fairview has filed a Motion to Strike the Declaration of Bohler (Docket No. 186), to which Bohler has filed a Response (Docket No. 206). For the reasons set out herein, the Motion to Strike will be denied, the defendants' motions for summary judgment will be granted, and Bohler's motion for summary judgment will be denied. Because the court's accompanying Order will resolve all outstanding claims, the City of Fairview's Motion to Continue and Reset Trial Date (Docket No. 196) will be denied as moot.

# I. BACKGROUND

## A. The Parties

**City of Fairview.** Fairview is a small city of about 8,000 people in northwestern Williamson County, Tennessee. (Docket No. 168 ¶¶ 3–4.) It is incorporated under a "city manager-commission" charter. (*Id.* ¶ 5) *See* Tenn. Code Ann. §§ 6-18-101 to -22-130. Under that model, Fairview is governed by a Board of Commissioners, with the government's day-to-day operations overseen by a City Manager. Tenn. Code Ann. § 6-21-101. The Board consists of an elected Mayor and four elected at-large commissioners. Tenn. Code Ann. §§ 6-20-101(b), (f), 6-20-201. The City Manager is appointed by the Board. Tenn. Code Ann. § 6-21-101. On August 1, 2016, Ronnie Scott Collins became Fairview's City Manager. (Docket No. 193 ¶ 10.) Prior to Collins, the City Manager had been Wayne Hall. (*Id.* ¶ 17.)

Among the functions performed by the Fairview municipal government is the operation of the Fairview Police Department ("FPD"). The City Manager has the authority to appoint, remove, and discipline all department heads and subordinate employees, including members of the FPD. (*Id.* ¶ 5.)

**David Paul Bohler.** Bohler was hired as a police officer by the FPD in 2011. (*Id.* ¶ 6.) He was later promoted to the position of detective. (Docket No. 188 ¶ 1.) As a detective, Bohler's primary duty was to "perform criminal investigations and deter criminal activity within the community." (Docket No. 193 ¶ 7.) His responsibilities included coordinating with the Williamson County District Attorney's office in order to "avoid mishandling of cases," as well as coordinating, as needed, with other federal, state and local law enforcement agencies. (*Id.* ¶ 8.) As a member of the FPD, Bohler was subject to General Order 2.02, which provided that "[m]embers having knowledge of other members violating laws, ordinances or departmental rules or disobeying orders

shall report such violations to the chief of police or supervisor immediately, either [orally] or in writing." (*Id.* ¶ 9.) Bohler reported to Assistant Police Chief Mark Sutton, who was the son of Vice Mayor Tony Sutton. (Docket No. 188 ¶ 13.)

**Timothy Shane Dunning and Joseph Cox.** Dunning and Cox were also FPD officers. Dunning, Cox, Bohler, and a number of other FPD employees and employees' spouses were involved in, witness to, and/or affected by a complicated web of gossip, conflict, accusations and cross-accusations that (none of the parties appear to dispute) added up to an environment of significant dysfunction within the FPD and eventually gave rise, not only to this litigation, but to other significant, public disputes not directly at issue in this case. A full retelling of everything that occurred between FPD members in 2015 and 2016 would go far beyond the scope of this opinion. Suffice it to say, the department was rife with interpersonal hostility.

## B. Bohler's Complaints About Alleged Wrongdoing in the FPD

**Robert Hamilton Case.** In July 2015, a Williamson County man named Robert Hamilton called Bohler and reported that he had received phone calls from Dunning, in which Dunning threatened to come to Hamilton's home with a search warrant and search it in front of Hamilton's family. Hamilton explained that Dunning appeared to have been making the threats because of a civil lawsuit between Hamilton and a friend of Mark Sutton. (Docket No. 170-1 at 190; Docket No. 193 ¶ 22; *see also* Docket No. 188 ¶ 2.) Bohler attempted to locate a corresponding case regarding Hamilton, but was unable to find one at the time, so he advised Hamilton to complain to the Chief of Police and left the matter at that. (Docket No. 193 ¶ 22.) Several months later, however, in mid-February 2016, Williamson County District Attorney Kim Helper contacted Bohler and asked him to review three cases that were apparently missing necessary information. One of those files involved Hamilton. (*Id.* ¶ 24.) Recognizing the name, Bohler contacted

Hamilton, who explained to Bohler that he had been "set up" and arrested by Dunning on allegedly false charges, supposedly at the direction of Mark Sutton. (*Id.* ¶ 26.)

Bohler raised the issue with his supervisors, Pat Stockdale and Travis O'Neal, but Stockdale and O'Neal did nothing. Bohler then sent a text message to District Attorney Helper, alerting her to the issues with the Hamilton case. (*Id.* ¶¶ 27–28.) He claims that his initial text to Helper on the matter was sent while he was off duty, but he later followed up with a phone call. (Docket No. 173-1 ¶¶ 4–5.)

Bohler also spoke with FPD Chief Terry Harris about the matter, and Harris told Bohler to obtain all the information he could about the situation and turn that information over to Helper. (Docket No. 193 ¶ 29.) After trying unsuccessfully to get more relevant information from Cox, Bohler called Helper and further explained the situation. (*Id.* ¶¶ 30–31.) According to Bohler, Dunning and Cox began making hostile and harassing comments to and/or about him after they learned that he had reported the alleged scheme against Hamilton. (Docket No. 188 ¶¶ 7–8.)

Eventually, District Attorney Helper had the charges against Hamilton dismissed. She has testified that the decision to seek dismissal of the charges was based on "a lot of factors" and was conditioned on Hamilton's forfeiting a firearm. Bohler maintains that the decision to drop the charges was the result of his whistleblowing. (*Id.* ¶ 5; Docket No. 191-4 at 22, 35.)

**Stockdale/Sutton Altercation.** On February 3, 2016, Bohler, while on the job at the FPD, witnessed a heated verbal confrontation between Stockdale and Mark Sutton. (Docket No. 193 ¶ 20.) Stockdale reported the incident to then-City Manager Hall. Shortly thereafter, Stockdale asked Bohler to draft a written statement, memorializing his recollection of what he witnessed as part of the department's internal handling of the matter. (*Id.* ¶ 21.)

**C. Allegations Regarding Bohler Circulated by Dunning and Cox**

Bohler alleges that, no later than June 2016, Dunning and Cox began circulating allegations that Bohler had "stolen sick time." (Docket No. 184 ¶ 10; Docket No. 188 ¶ 10.) Specifically, Fairview Commissioner Shannon Crutcher testified that a group of officers, including Dunning and Cox, told her that Bohler had "used up all of his sick time and that he had gone over and above that and had not reported it." (Docket No. 173-8 at 13.) Crutcher testified that the comments about Bohler were just one of several instances of "dirt on . . . other individuals in the police department" brought to her by the officers at the meeting. (*Id.*) As Crutcher described the allegations:

> Oh, gosh. They talked about [Officer Name] and the fact that [he] wasn't P.O.S.T. [Peace Officer Standards and Training] certifi[ed]. They talked about Mark Sutton and things that he allegedly did. You can just go down the list. Basically, anybody that wasn't there, there was something that they had participated in that was wrong, whether it be training, whether it be some criminal act. They had something.

(*Id.*)

Dunning and Cox concede that they were, at the time, looking into the possibility that Bohler, who had missed a significant amount of work for cancer treatment, had used more paid sick leave than he was entitled to. (Docket No. 184 ¶ 11.) Bohler's treatment had included chemotherapy and five separate surgeries in 2015 and 2016. (Docket No. 177 ¶ 48.)

In his deposition testimony, Cox explained that there was a display in the FPD's squad room that showed individuals' leave time, and it appeared to him that Bohler was taking sick leave without corresponding hours being removed from his leave balance.[1] Cox admitted that he had no evidence that Bohler was "manipulating [the chart] personally" but that it appeared that Bohler was "getting paid for being off work, and they were not deducting the time out of his sick bank."

---

[1] Bohler concedes that this display existed but states that he did not pay attention to it. (Docket No. 177 ¶ 56.)

(Docket No. 173-7 at 23.) Cox testified that he did not recall ever using the word "steal" to describe Bohler's behavior. Cox testified, rather, that he had suspected that FPD leaders "felt sorry for" Bohler in light of Bohler's cancer battle and that Bohler was therefore allowed to exceed his allotted paid leave time while continuing to receive pay. (*Id.* at 22–23.) Consistently with that hypothesis, another FPD officer, Jennifer Whittaker, testified that it was her understanding that Chief Harris had decided that Bohler would be allowed to take whatever leave he needed for his chemotherapy and other treatments and his sick time would not be deducted. (Docket No. 165-7 at 23.)

Bohler has admitted that, when he was undergoing cancer treatment, he never looked to see how much sick leave he had accrued or used. He testified in his deposition that, because he had not paid attention to the matter, he did not know whether or not he missed more work than his paid medical leave would have covered. (Docket No. 177 ¶¶ 50, 52.) Bohler, however, has produced a Declaration by Sharon Gayle Taylor, who states that she was responsible for verifying and submitting FPD payroll records from 2014 through 2016, including with regard to Bohler's use of paid medical leave. (Docket No. 173-3 ¶ 1.) According to Taylor, Bohler's bank of paid time off "was charged for each day that he was absent from work, receiving treatment." (*Id.* ¶ 3.) She explained, however, why it may have appeared that he was taking time off without its being deducted from his balance. According to Taylor, Bohler, "[a]s a Detective, . . . was classified as a salaried (exempt) employee," and, therefore, "he would only have to work two hours on any particular day in order to avoid having to use up a sick day." (*Id.* ¶ 5.) Bohler, moreover, "often worked remotely." (*Id.* ¶ 7.) Accordingly, on a given day, Bohler may not have come in to the FPD's brick-and-mortar facilities and may have spent a substantial portion of the day receiving cancer treatment, but, as long as he was able to perform two hours of work by, for example,

"work[ing] administratively on his case files," he was able to avoid depleting his leave time.[2] (*Id.*

¶¶ 5–6.) Bohler testified that, if he had exceeded his allotted paid leave, his paycheck should have

been docked, and, to his knowledge, it never was. (Docket No. 177 ¶ 58.)

## D. Bohler's Resignation and Lawsuits

On October 1, 2016, Bohler married fellow FPD officer Shawn Malhoit—a marriage that,

depending on the spouses' respective job titles and responsibilities, had the capacity to implicate

Fairview's anti-nepotism policies. (Docket No. 193 ¶ 11.) On October 11, 2016, City Manager

Collins met with Bohler to discuss two matters: the potential reorganization of the FPD and the

application of the FPD's anti-nepotism policies to Bohler going forward. Bohler has provided an

audio recording of the meeting. (*See* Docket No. 194 (Notice of Manual Filing).) Based on the

audio provided, Collins' discussion of the potential reorganization and the nepotism policies was

at times muddled. The parties agree, however, that Collins informed Bohler that Bohler would no

longer be able to continue as a detective. Based on the audio, Collins initially informed Bohler

that, as he understood it, both Bohler's detective position and any potential post-reorganization

supervisory position implicated the anti-nepotism policies with regard to Bohler's marriage. In

their meeting, Bohler disputed the premise that the detective position involved the kind of

management responsibilities that would give rise to a nepotism issue with regard to his wife.

Collins responded that the nepotism policy was only one potential obstacle to Bohler's

remaining a detective, because the proposed reorganization would have eliminated permanent

---

[2] In contrast, the defendants, as part of Bohler's deposition, produced records seeming to establish that Bohler took sick leave in excess of the hours he had earned. (Docket No. 165-1 ex. 13, 25.) Notably, the Taylor Declaration focuses on the topic of "sick day[s]," whereas the payroll records appear to discuss leave in terms of hours. The purported payroll records, however, have their own deficiencies, because they do not contain any explanation of the underlying policies or, for example, whether Bohler could have dipped into his other leave time after running out of sick leave. At the summary judgment stage, and particularly without a more detailed accounting of how the City's records should be read and what its policies were, the court cannot resolve the disputed issue of whether Bohler used more paid leave than he was owed.

detective positions as they had previously functioned. Collins and the City have since explained that the plan was for the FPD to transition to having "investigator" positions that its officers would rotate into and out of for limited periods, although Bohler disputes whether any such reorganization ever actually occurred. (Docket No. 193 ¶¶ 13–14.) The audio shows that Bohler and Collins debated the application of FPD policies at length, with Collins insisting that there was no alternative but for Bohler to move to a non-detective position.

Either immediately after the meeting or the next day, Bohler submitted a formal grievance to Collins regarding his potential demotion. (*Id.* ¶ 16.) In response, Collins scheduled a meeting between him, Bohler, Mark Sutton, and former City Manager Wayne Hall for October 13, 2016. (*Id.* ¶ 17.) Collins has testified that the purpose of the meeting was to discuss FPD's nepotism policy in further detail with Bohler as well as with the other attendees, who could clarify or explain the policy's application to Bohler's potential post-reorganization placements. (*Id.* ¶ 18.) At his deposition, Collins testified that, from his perspective, the "purpose" of the October 13 meeting "was to assist Mr. Bohler, not to penalize him." (Docket No. 170-2 at 135.) Collins reiterated:

> The purpose of our meeting on the 13th was to assist Mr. Bohler. My effort was to find out was I right or wrong in the interpretation [of the relevant policies]. Had we gotten in that meeting and I found out that Mr. Hall and Mr. Sutton and Mr. Bohler all agree that my interpretation of that policy was wrong, then I would have had to make another adjustment. Likely what I would have had to have done would have been to remove Mr. Bohler from detective and either make him a lieutenant—well, I couldn't make him a lieutenant because of the—because of the nepotism, because that's clearly a problem with the lieutenant there. Detectives were going away, so likely what would have happened in that case is, had there not been a nepotism issue, then Mr. Bohler would have had to come out of detectives and be made whole financially in another position.

(*Id.* at 145–46.) Collins explained that, as he understood it, "absent of nepotism," he "had an obligation to Mr. Bohler . . . not to affect [his] pay," meaning apparently that, if Bohler's wife had resigned (as she had considered doing) Bohler may have been able to preserve his salary, if not his

position.[3] (*Id.* at 146.) On October 13, 2016, Bohler, rather than attending the proposed meeting, resigned from Fairview's police force. (Docket No. 188 ¶ 28; Docket No. 193 ¶ 19.)

On November 23, 2016, Bohler filed a Complaint in Williamson County Circuit Court, naming the City of Fairview, Stockdale, Dunning, and Cox as defendants. (Docket No. 193 ¶ 1.) His complaint included a claim for retaliatory constructive discharge pursuant to the Tennessee Public Protection Act ("TPPA"), which provides that no employee "shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b); *see Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011). (Docket No. 193 ¶ 3.) On July 19, 2017, Bohler filed a Notice of Voluntary Dismissal, which Judge Deanna Johnson signed and entered on August 4, 2017. (*Id.* ¶ 4.)

On October 15, 2017, Bohler filed his Complaint in this court, naming a long list of defendants and pleading ten counts, which were not always clearly delineated between individual defendants. (Docket No. 1.) Count I was a claim, pursuant to 42 U.S.C. §§ 1983 and 1985, for conspiracy to deprive Bohler of his constitutional rights. (*Id.* ¶¶ 152–54.) Count II was a § 1983 claim for deprivation of due process. (*Id.* ¶¶ 155–62.) Count III was a § 1983 claim for violation of Bohler's right to free speech. (*Id.* ¶¶ 163–68.) Count IV was a § 1983 claim for the denial of Bohler's right to equal protection. (*Id.* ¶¶ 169–74.) Count V was a claim for violation of the TPPA and common law retaliation. (*Id.* ¶¶ 175–79.) Count VI was a claim for defamation by slander or libel. (*Id.* ¶¶ 180–83.) Count VII was a claim for unlawful invasion of privacy. (*Id.* ¶¶ 184–88.) Count VIII was a claim for official oppression in violation of Tenn. Code Ann. § 39-16-403. (*Id.* ¶¶ 189–94.) Count IX was a claim for tampering with or fabricating evidence in violation of Tenn.

---

[3] The precise details of how these policies would have ultimately been applied to Bohler were never resolved, and the court, for purposes of the pending motions, is not accepting Collins' account as undisputed.

Code Ann. § 39-16-503. (*Id.* ¶¶ 195–201.) Count X was a claim for intentional interference with employment. (*Id.* ¶¶ 202–05.)

After a number of motions and multiple opinions from this court, the only defendants who remain are Dunning, Cox, and the City, and the only claims still pending are Bohler's defamation claims against Dunning and Cox and his First Amendment retaliation and conspiracy claims against the City. (*See* Docket No. 135 at 1; Docket No. 152 at 1.) Each of the parties has sought summary judgment (Docket Nos. 162, 167, & 172) as to these remaining claims, and the City has moved to strike a Declaration on which Bohler relies for his Motion (Docket No. 186).

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Motion to Strike

In support of his Motion for Summary Judgment, Bohler filed a signed and dated Declaration, setting forth various details regarding his time at the FPD. (Docket No. 173-1.) Some of the assertions in the Declaration are of the sort that Bohler could be expected to be able to make based on direct personal knowledge. Other aspects of the Declaration, however, include allegations for which the Declaration does not set forth a basis for Bohler's knowledge, and some paragraphs include what could be characterized as legal opinion. The City of Fairview has moved for the court to strike the Declaration on the ground that it does not comply with Rule 56(c)(4)'s requirement that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Rule 56(c), in its current form, embodies a flexible standard for supporting or opposing a motion for summary judgment, focused on eventual admissibility at trial:

> As amended in 2010, Federal Rule of Civil Procedure 56 provides that parties asserting a genuinely disputed fact need only "cit[e] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). It then permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that

would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Once an objection is properly made, the proponent must "show that the material is admissible as presented or . . . explain the admissible form that is anticipated."

*Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment); *see also* Jeffrey W. Stempel *et al.*, 11–56 Moore's Federal Practice—Civil § 56.91 (2018) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial."); Charles Alan Wright & Arthur R. Miller et al., 10A Fed. Prac. & Proc. Civ. § 2721 (4th ed.) ("The court and the parties have great flexibility with regard to the evidence that may be used in a Rule 56 proceeding."). Under this court's Local Rules, the "record," for Rule 56 purposes, includes all "documents filed in support of or in opposition to the motion or documents otherwise in the court file." L.R. 56.01(e).

Given the flexibility typically permitted in supporting a motion for summary judgment, the court will not strike Bohler's Declaration outright. Moreover, as Bohler points out, some of the statements to which the City objects may have explanatory weight, even if Rule 56(c)(4) or the Rules of Evidence would limit the purposes for which they could be used. For example, while Bohler may not be able to offer a legal opinion of his particular duties as an FPD detective, he can testify to his contemporary understanding of those duties.

Rather than striking the Declaration, the court will treat it as it would any other piece of the record offered in support of a Rule 56 motion: by considering both what it establishes and what it does not establish, in light of the information actually conveyed and omitted. The defendants are entitled to rely on the deficiencies they have cited in support of their opposition to Bohler's motion, insofar as those deficiencies are relevant to whether there is an actual dispute of a material fact or whether Bohler has adequately supported an assertion. Then, insofar as it is necessary, the

materiality and sufficiency of Bohler's assertions can be considered on a case-by-case basis—although the court notes that, based on the analysis below, which largely hinges on other facts, parsing the Declaration was largely not required to resolve Bohler's claims.

## B. First Amendment Retaliation Claim

Bohler argues that he was threatened with demotion and constructively discharged based on his First Amendment-protected speech, particularly regarding the Hamilton case. A cause of action for First Amendment retaliation requires an employee to demonstrate that: "(1) [he] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Mills v. Williams*, 276 F. App'x. 417, 418 (6th Cir. 2008) (citing *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)).

Public employees generally have "no right to object to conditions placed upon the terms of employment—including those which restrict[] the exercise of constitutional rights," but "[t]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)); *accord Keeling v. Coffee Cty.*, 541 F. App'x. 522, 526 (6th Cir. 2013). Accordingly, the Sixth Circuit has held that a public employee's speech is constitutionally protected if (1) in making the speech, the employee was speaking as a citizen, and not as a public employee acting in furtherance of his ordinary responsibilities; and (2) the speech was on a matter of public concern. *See Boulton v. Swanson*, 795 F. 3d 526, 531–32, 534 (6th Cir. 2015). A public employee has "no First Amendment cause of action based on his . . . employer's reaction" to speech that was not made as a private citizen on a matter of public concern and was,

therefore, not constitutionally protected. *Garcetti*, 547 U.S. at 418. The question of whether a public employee engaged in constitutionally protected speech is a question of law that is determined by the court. *Mayhew v. Town of Smyrna,* 856 F.3d 456, 464 (6th Cir. 2017).

The standard for determining when a public employee's speech is exempted from First Amendment protection was initially explained by the Supreme Court a decade ago in *Garcetti*, which held that a public employee does not speak as a citizen when his speech "owes its existence to the public employee's professional responsibilities." 547 U.S. at 421–22. After *Garcetti*, many courts read this exception to First Amendment protection broadly, to the point that a public employee's speech could be left unprotected, even when there was no real relationship between the employee's speech and his actual job duties. *See Boulton*, 795 F.3d at 533 (reversing a district court that read *Garcetti* too broadly). The Supreme Court addressed the breadth of the *Garcetti* exception in *Lane v. Franks*, 134 S. Ct. 2369 (2014), where it expressly rejected an overly expansive reading. The Court reasoned that "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment," and a "critical question" was "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id*. at 2379.

"After *Lane*, the *Garcetti* exception to First Amendment protection for speech . . . must be read narrowly as speech that an employee made *in furtherance of the ordinary responsibilities of his employment*." *Boulton*, 795 F.3d at 534 (6th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 411) (emphasis added). Accordingly, "[t]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into" an unprotected utterance. *Lane*, 134 S. Ct. at 2379. This is for good reason: "speech by public employees on

subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Id.*

The Sixth Circuit has provided guidance on defining an employee's duties in such cases:

> Determining whether an employee speaks as a private citizen or as a public employee can be challenging. The Supreme Court has not "articulate[d] a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." Instead, the "proper inquiry is a practical one." To aid in the assessment of a public employee's statement, "we must consider both its content and context." In our pre-*Lane* case law, we recognized several non-exhaustive factors to consider, including: the speech's impetus; its setting; its audience; and its general subject matter. We have continued to utilize these "who, where, what, when, why, and how" considerations post-*Lane*, which inform the answer to *Lane's* "critical question": "whether the speech at issue is itself ordinarily within the scope of an employee's duties."

*Mayhew*, 856 F.3d at 464 (internal citations omitted).

Based on those factors, Bohler's claimed whistleblowing regarding the Hamilton incident falls within the scope of his professional duties. Both Hamilton and District Attorney Helper approached Bohler in his capacity as a police detective to assist in making sure that the Hamilton case was handled properly. Bohler went through ordinary channels in doing so, gathering evidence and working with local prosecutors in order to provide necessary context for the decision of whether to pursue a criminal case against Hamilton. Bohler makes much of the fact that he did not have a specific duty to report the issues involving the Hamilton case to Helper. However, he has not identified any case holding that a specific duty to convey a particular fact to a particular person is required for a statement to fall within a public employee's employment-related duties. Moreover, Bohler did have at least a general duty to assist local prosecutors where necessary on cases that were referred by the FPD or on which the FPD had needed information. Similarly, any statements he made about the altercation between Stockdale and Sutton—insofar as Bohler still seeks to rely

on those statements in support of this claim—were made in the context of ordinary FPD discipline and oversight.

Citing *Mayhew v. Town of Smyrna*, Bohler argues that "[c]ommunicating complaints about issues of crime—even issues of non-criminal misconduct—if done outside of the chain of command, will typically constitute protected speech." (Docket No. 172 at 12.) But neither *Mayhew* nor any other case identified by Bohler sets forth so strong a categorical rule. *Mayhew* does acknowledge that "allegations of public corruption" are typically the type of speech entitled to strong First Amendment protection. 856 F.3d at 468. The question of whether the topic at issue is of public concern, however, is just one-half of the inquiry in a public employee speech case; the other half of the test looks at the role and duties of the particular employee at issue and the relationship of those duties to the relevant communications. Indeed, the City does not dispute, at least for summary judgment purposes, that the allegations related to Hamilton involved matters of public concern. Police investigations, however, routinely touch on such issues; both crime in general and the functioning of the police force are matters within the concern of the public. But an "issues of crime/misconduct" exception, when applied to police, would wholly swallow the ordinary rule that a public employer can typically control an employee's speech within the course of his ordinary duties.

Bohler presumably would respond that he proposes only a limited exception for statements "outside the chain of command." The concept of the "chain of command," however, has limited use when dealing with matters that inherently require interagency cooperation, such as police assistance in prosecutions. Bohler's suggestion that he went "outside the chain of command" by talking to Helper, while perhaps technically true, loses sight of the well established duties of local police relative to local prosecutors. Admittedly, District Attorney Helper was not Bohler's boss or

the person to whom he had an initial obligation to report officer wrongdoing. But she and her agency had prosecutorial authority in the county, and coordinating with that office was a core aspect of Bohler's duties. Indeed, it was Helper who came to Bohler about Hamilton, not the other way around, when Helper asked him questions about the case in his status as a police officer.[4]

Bohler also likens this case to *Barrow v. City of Hillview, Kentucky*, 775 F. App'x 801 (6th Cir. 2019), in which the Sixth Circuit held, in an unpublished opinion, that police officers who participated in an FBI investigation of other officers' wrongdoing were acting as private citizens for First Amendment purposes. The court concluded that,

> although [the officers'] cooperation with the FBI concerned information they learned as police officers, their ordinary job responsibilities did not include reporting allegations of public corruption to outside authorities. Neither Barrow nor Cook was employed by the FBI, and their participation in the FBI investigation was distinct from their obligations as Hillview police officers.

*Id.* at 813. The Hamilton case, however, was not an outside federal investigation of police wrongdoing. It was, by Bohler's own account, a case initiated by the FPD itself—Bohler's own agency—and referred to the local prosecutor's office with whom Bohler would ordinarily cooperate on day-to-day prosecutions. That prosecutor's office then approached Bohler, in his capacity as a detective, to assist it. Bohler's actions to assist in the District Attorney's proper resolution of the Hamilton case, in short, were well within the ordinary duties of a police officer. Bohler's internal discussions with other FPD personnel about the situation were similarly well within Bohler's ordinary duties.[5]

---

[4] Bohler did allegedly make a veiled comment about the Hamilton case on Facebook, which, because of its setting, would be more likely to pass the test for protected speech. (Docket No. 173-1 ¶¶ 20–21.) Bohler, however, has not been able to identify any basis for concluding that that comment in particular was the basis for his threatened demotion.

[5] Bohler advances one additional argument that bears mentioning. Bohler argues that, as a police officer, his only duty was to assist prosecutors in *obtaining* convictions, and his statements about the Hamilton case fell outside his duties because he was "sabotaging a wrongful prosecution." (Docket No. 192 at 4.) Bohler

That is not to say, however, that Bohler's speaking out about FPD misconduct was wholly unprotected. The TPPA, in particular, has a well-established history of being invoked by fired whistleblowers, including police officers. *See, e.g.*, *Williams v. City of Burns*, 465 S.W.3d 96, 123 (Tenn. 2015); *Weinert v. City of Sevierville*, No. E2018-00479-COA-R3-CV, 2019 WL 319892, at *6 (Tenn. Ct. App. Jan. 23, 2019); *Jones v. City of Union City*, No. 2013-02358-COA-R3-CV, 2015 WL 9257815, at *4 (Tenn. Ct. App. Dec. 17, 2015). Bohler filed a TPPA claim in his original state-court litigation and in this case. The only reason that that claim is not currently pending is that, when Bohler filed his federal Complaint, the TPPA claim was untimely. (Docket No. 134 at 23.) Therefore, while it may be regrettable that an officer in Bohler's alleged position would lack protection, the court cannot expand the scope of the First Amendment to fill a gap that exists due to Bohler's own litigation decisions. Because all of the relevant statements were made as part of Bohler's ordinary duties as a government employee, in contexts directly arising out of those job duties, and not in his capacity as a private citizen, the First Amendment is not the appropriate place for him to look for protection.[6] The court will grant the City of Fairview's motion for summary judgment on Bohler's First Amendment retaliation claim and the associated claim of conspiracy.[7]

## C. Defamation Claims

The scope of Bohler's defamation claims has frequently been unclear in his briefing and pleadings. In his opposition to the Motion for Summary Judgment filed by Dunning and Cox,

---

has identified no basis in Tennessee law for concluding that a local police officer's duties are limited to obtaining convictions, even in cases of wrongful prosecution, as opposed to following each case where it ethically and truthfully leads.

[6] Bohler, moreover, has failed to identify any grounds on which he could prevail on his conspiracy claims if his First Amendment retaliation claim fails.

[7] Because the court is basing its ruling on the non-protected nature of Bohler's underlying speech, the court has no occasion to consider the admissibility of the email discussed in the telephone conference of November 19, 2019, which concerned City Manager Collins' reaction to Bohler's resignation.

however, he appears to abandon any theory that he is entitled to recover for defamation arising out of any statements by the individual defendants other than their supposed allegations that Bohler was "stealing sick time." (Docket No. 180 at 1, 10.) Dunning and Cox argue that, insofar as they made any such comments, their statements were merely non-defamatory statements of concern that Bohler was receiving paid absences in excess of the paid medical leave available to him under the FPD's policies.

In Tennessee, to establish a *prima facie* case of defamation, a plaintiff must prove that: "(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement*." Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (citations omitted). "Publication is a term of art meaning the communication of defamatory matter to a third person. In the case of slander [or spoken defamation], 'publication' occurs when the defamatory matter is spoken." *Id.* (citation omitted). In addition, "only statements that are false are actionable." *Id.* (citation omitted). Finally, to establish any type of defamation claim, the plaintiff must prove that the defamation resulted in injury to her character and reputation. *Id.*

The plaintiff's burden for establishing the third element of defamation is heightened if he is a public figure, either generally or for a limited purpose related to the statement at issue. Specifically, "if the plaintiff is a public figure, the plaintiff must also establish that the defendant published the defamatory statement with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 527 (6th Cir. 2014) (internal citations and quotation marks omitted). A relatively limited number of people qualify as "general-purpose public figures . . . for all

purposes and contexts" by virtue of their "pervasive fame or notoriety." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). A broader number of people, however, qualify as "limited-purpose public figure[s] . . . with respect to 'a limited range of issues.'" *Id.* (quoting Gertz, 418 U.S. at 351.) "Limited-purpose public figure" status is most often thought of in terms of whether a person "voluntarily inject[ed] himself . . . into a particular public controversy." *Id.* (quoting *Gertz*, 418 U.S. at 351). For the purposes of the Tennessee tort of defamation, however, Tennessee has recognized that, for some matters of valid public concern, the test for being a limited-purpose public figure can also reach, more generally, "those who assume special prominence in the resolution of public questions." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (quoting *Press, Inc. v. Verran*, 569 S.W.2d 435, 441 (Tenn. 1978)).

Numerous courts have held that police officers are capable of attaining public figure status by virtue of their police work and the special position of trust and authority granted to them in a community, although the Sixth Circuit itself has never endorsed the rule that rank-and-file officers should categorically be assumed to be such. *See Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732, 743 (E.D. Mich. 2014) (collecting cases). However, the public importance of individual officers is enhanced in a small city such as Fairview, where only a comparatively small number of people wield police power. Bohler was, therefore, a public servant in a position of significant importance in Fairview. Moreover, as a detective, he was entrusted with responsibilities beyond those of ordinary rank-and-file officers. Indeed, he appears even to have been considered, at one point, as a potential candidate for interim Chief of Police. Finally, insofar as one must identify a particular "controversy" to which Bohler's public figure status is tethered, there is ample evidence that the administration of the FPD was, in fact, a subject of significant controversy, in which Bohler was directly involved. That controversy included the question of whether the FPD had fostered an

environment of tolerated misconduct and disregard for department policies. The court therefore holds that Bohler was at least a limited-purpose public figure for issues related to FPD administration, if not a general purpose public figure based on his status as a public official. *Cf. Spicer v. Thompson*, No. M2002-03110-COA-R3-CV, 2004 WL 1531431, at *22 (Tenn. Ct. App. July 7, 2004) (observing, in *dicta*, that "police officers are 'public figures' within the [Supreme Court's] rule" and requiring actual malice for claim by officer who conceded his public figure status).

There is little doubt that Bohler has produced evidence sufficient to show that Dunning and Cox gossiped about him, just as they and other officers apparently gossiped a great deal about each other. A negative statement about another person, however, is not defamatory merely because it was made out of "personal ill will, hatred, spite, or [a] desire to injure." *Hibdon v. Grabowski*, 195 S.W.3d 48, 63 (Tenn. Ct. App. 2005) (quoting *McWhorter v. Barre*, 132 S.W.3d 354, 365 (Tenn. Ct. App. 2003)).

Bohler suggests that any allegations that he "stole" sick time were false (and the individual defendants knew or should have known they were false) because Bohler did not have control over how much sick time he was given, did not falsify any records in order to receive excessive leave time, and, despite missing a great deal of work, was complying with all FPD leave policies. Bohler's argument hinges in significant part on the assumption that the phrase "stealing sick time" necessarily suggests that he falsified time statements or engaged in some comparable affirmative wrongdoing. However, there is no settled, specific meaning for "stealing sick time," and Bohler has not provided evidence sufficient to allow a jury to conclude that the term had taken on a more specific meaning within the FPD. The court must, therefore, take the vague, figurative nature of the term into account when assessing the issue of falsity. The undisputed evidence shows that

Bohler did, in fact, miss a great deal of work for cancer treatment and that he nevertheless continued to receive pay, which Dunning and Cox say led them to believe that he was receiving more paid leave time than he was entitled to. The phrase "stealing sick time" could be read to encompass an allegation of that sort. However, the vague language that Bohler accuses Dunning and Cox of using presents an obstacle to establishing both falsity and malice.

With regard to falsity, the version of the FPD leave policies set out in the Taylor Declaration would probably be enough to create a disputed issue of fact. With regard to malice, however, even Bohler's own version of events explains why Dunning and Cox could have reasonably developed a belief that he was exceeding his allotted sick leave. They knew that Bohler was very sick and was missing a great deal of time for his cancer treatment that he otherwise would have spent at work. Nevertheless, the leave time displayed for him did not reflect that his leave was being docked at a corresponding rate. The Taylor Declaration offers an explanation for why that may have been the case. But even if Taylor is correct, that does not mean that Dunning and Cox knew their statements were false or that they were reckless about their veracity.

The difficulty of establishing falsity and knowledge or recklessness with regard to the defendants' statements about leave time is exacerbated by the fact that, because the statements were oral, it is difficult, if not impossible, to know exactly what was said. In cases such as this one, involving suspicions and gossip, it is important, wherever possible, to closely evaluate what was said, to determine if allegations were made with the level of apparent certainty necessary to actually be defamatory. A mere statement of suspicion, if phrased as such and based on evidence, is not rendered defamatory merely because the suspicion turns out to have been false. *See Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015) ("[A] statement cannot be defamatory if 'it is plain that the speaker is expressing . . . a theory, conjecture, or surmise, rather than claiming to be in

possession of objectively verifiable facts.'") (quoting *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000)).

Moreover, even if Bohler could establish falsity and recklessness, there is no evidence sufficient for a jury to conclude that his reputation was actually harmed by the leave-time allegations. "The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994) (citing *Little Stores v. Isenberg*, 172 S.W.2d 13, 16 (Tenn. Ct. App. 1943)). Bohler suggests that he does not need to demonstrate his injury at the summary judgment stage, because his injury would go only to damages. Bohler's argument, however, confuses the question of a damages calculation with the question of whether he was injured in the manner reached by the law of defamation *at all*. "A published statement is not libelous because the subject of the publication finds it annoying, offensive or embarrassing. Rather, the statement must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule[] and convey an element of disgrace." *Grant v. Commercial Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *9 (Tenn. Ct. App. Sept. 18, 2015) (quoting *Aegis Scis. Corp. v. Zelenik*, No. M2012-00898-COA-R3CV, 2013 WL 175807, at *5 (Tenn. Ct. App. Jan. 16, 2013)) (internal quotation marks omitted).

It was apparently widely known that Bohler was battling cancer, and there is no reason to assume that his reputation would have been harmed by anyone's knowledge that his treatments had required him to miss work. The only possible harm, then, could have come from the alleged suggestions that he handled the reporting or calculation of his leave time in some improper way. The vagueness of the alleged wrongdoing, however, significantly detracts from the level of disgrace implied. Moreover, none of the surrounding evidence suggests Bohler's reputation was

actually harmed. Bohler admits that the allegations were never the subject of any discipline against him or, at least to his knowledge, any formal investigation. (Docket No. 177 ¶ 82.) Bohler himself testified that the believed that Chief Harris was unconcerned about the leave-time issue, and no Fairview commissioner has suggested that his or her estimation of Bohler was changed by the allegations. Although an audio recording of a conversation between Bohler, Amonette, and Chief Harris reveals that there may have been a general impression that Bohler could be at risk of being in some kind of trouble related to leave, it also reflects the vague and conjectural nature of the gossip surrounding the issue. Bohler's professional reputation, moreover, appears to have survived the rumors intact, as he now works in private security, making significantly more than he did at the FPD. (*See* Docket No. 185-1 at 35, 123.)

The possibility of harm from the allegations is further mitigated by the fact that any leave time-related allegations against Bohler would have arisen out of a plainly dysfunctional environment rife with gossip and interpersonal criticism, making it unlikely that the allegations against him would have been taken uncritically or at face value. Over the course of several opinions, the court has documented the substantial interpersonal dysfunction at the FPD in the period leading up to Bohler's resignation. The individuals, such as Commissioner Crutcher, who heard the allegations, would have been aware of at least some of the context. Indeed, Crutcher's own description represents the leave-time allegations as part of a torrent of recriminations unleashed between FPD officers. The likelihood that any one such allegation was likely to do much harm, particularly one involving leave taken for cancer treatment, is slight, and there is no evidence to suggest that the harm was done. While Bohler and his peers may have harmed their own reputations, in a broad sense, by contributing to a dysfunctional department, there is no evidence

that Bohler's reputation was harmed specifically due to the leave-time allegations. Dunning and Cox are therefore entitled to summary judgment on the defamation claims.

### III. CONCLUSION

For the foregoing reasons, the court will grant the Motions for Summary Judgment filed by Dunning and Cox (Docket No. 162) and the City of Fairview (Docket No. 167) and will deny the Motion for Summary Judgment filed by Bohler (Docket No. 172). Fairview's Motion to Strike (Docket No. 186) will be denied and its Motion to Continue and Reset Trial (Docket No. 196) will be denied as moot.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge